**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Sean L. Litteral (State Bar No. 331985)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
    slitteral@bursor.com

**BURSOR & FISHER, P.A.**
Jonathan L. Wolloch (*pro hac vice* forthcoming)
701 Brickell Ave., Suite 1420
Miami, FL 33131
Telephone: (305) 330-5512
Facsimile:  (305) 676-9006
Email: jwolloch@bursor.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ROBIN HUMPHREY, individually and on behalf of all others similarly situated,<br><br>          Plaintiff,<br>  v.<br><br>THE J.M. SMUCKER COMPANY,<br><br>          Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br><u>JURY TRIAL DEMANDED</u> |

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Plaintiff Robin Humphrey ("Plaintiff") brings this action on behalf of herself, and all others similarly situated against The J.M. Smucker Company ("Defendant" or "Smucker").  Plaintiff makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to the allegations specifically pertaining to herself, which are based on personal knowledge.

### NATURE OF THE ACTION

1.      Plaintiff brings this Class action lawsuit on behalf of herself and similarly situated consumers ("Class Members") who purchased 9Lives-branded pet food,[1] Kibbles 'n Bits-branded pet food,[2] and Meow Mix-branded pet food[3] (the "Products"), which are misleading labeled as healthful despite containing titanium dioxide ("TiO2" or the "Additive").  Worse, the packaging of Defendant's products—which is essential and integral to delivering the food to consuming pets— also contain per-and polyfluoroalkyl substances ("PFAS"), which are synthetical chemicals that pose undue health risks further rendering Defendant's healthful representations false and misleading.

2.      Defendant has known of the health problems posed by TiO2 since at least February 2014 when big players in the food market publicly announced they would no longer use the additive in products due to health concerns.  These announcements have been widely reported on by several news outlets, including Time Magazine, CNN, The Guardian, and the Los Angeles Times.

3.      Major retailers of pet food, including retailers that at one time offered brands by Defendant, also announced that they would not sell pet food containing TiO2.

4.      The industry announcements were informed by scientific research concluding that TiO2 is unhealthy and unsafe for consumption.

5.      Similarly, in light of the growing scientific research, several nations have banned TiO2 because of its toxicity.  For example, in 2019, TiO2 was banned in France for human

---

[1] Those products include, but are not limited to, all flavors of 9 Lives: Daily Essentials, Indoor Complete, Seafood & Poultry Favorites, Plus Care.

[2] Those products include, but are not limited, all flavors of Kibbles 'n Bits: Original, Bacon and Steak, Bistro, Mini Bits, Complete and Balanced, and Homestyle.

[3] Those products include, but are not limited to, all flavors of Meow Mix: Original Choice, Tender Centers, Irresistible, Indoor Health, Seafood Medley, Bistro Recipes, and Ocean Explosion, amongst others.

consumption.  In May 2021, the European Food Safety Authority ("EFSA") released its report on the health concerns associated with TiO2, determining that TiO2 could not be considered safe for consumption for humans *or animals*.

6.      Professor Maged Younes, Chair of EFSA's expert Panel on Food Additives and Flavourings ("FAF") underscored these findings, stating that: "Taking into account all available scientific studies and data, the Panel concluded that titanium dioxide can no longer be considered safe as a food additive.  A critical element in reaching this conclusion is that we could not exclude genotoxicity concerns after consumption of titanium dioxide particles."

7.      Building on EFSA's research, the European Commission ("EC") announced that it too would adopt a ban on the use of TiO2 as a food additive.  The EC additionally announced it would adopt a ban on the use of TiO2 as a food additive for all animal species.

8.      Similarly, Defendant has long known of the health problems posed by PFAS, which persist and accumulate and are harmful even at very low levels.  PFAS have been shown to have a number of toxicological effects in laboratory studies as PFAS exposure raises a host of health effects, including but not limited to various cancers, liver damage, and immunotoxic effects.

9.      Defendant employs food scientists who focus on food safety and nutrition specifically for pet food products, including tracking industry developments concerning ingredients and additives.  Defendant also employs packaging engineers, scientists, and managers who focus on pet food products, including assessing suitability for direct food contact applications.

10.     Defendant nonetheless consistently makes various misrepresentations concerning the Products to convince consumers that the Products are healthful for consumption and do not expose pets to heightened risk of a host of health effects from consuming Defendant's Products.

11.     Defendant knew or should have known that titanium dioxide is unhealthy and raises health risks from various sources, including but not limited to information provided by certain of its major retailers and its food scientists.

12.     Nonetheless Defendant sells pet food containing TiO2 and PFAS, abusing the Public's trust and failing to inform consumers of the implications of consuming the toxins.  Instead, Defendant relies on the ingredient list, which is provided in tightly woven, miniscule block print on

1    the back of the Products, which consumers are unlikely to notice.  Defendant nowhere informs

2    consumers that the Products also contain PFAS.

3          13.    The inadequate labeling means that consumers who purchase Defendant's Products

4    are unaware that they are at heightened risk of a host of health effects stemming from TiO2 and

5    PFAS.

6          14.    Based on Defendant's omissions, a reasonable consumer would expect that the

7    Products are healthful and can be purchased and consumed as marketed and sold.  However, the

8    Products are not healthful and pose a significant health risk.  Yet, neither before nor at the time of

9    purchase does Defendant notify consumers like Plaintiff that the Products are not healthful, pose

10   health risks,  and should otherwise be approached with caution.

11         15.    Accordingly, Plaintiff brings her claims against Defendant individually and on behalf

12   of a class of all others similarly situated for (1) violation of California's Unfair Competition Law,

13   Cal. Bus. & Prof. Code § 17200, *et seq.*; (2) violation of the Consumers Legal Remedies Act, Cal.

14   Civ. Code § 1750, *et seq.*; (3) violation of California's False Advertising Law, Cal. Bus. & Prof.

15   Code § 17200, *et seq.*; (4) Fraud; (5) Constructive Fraud; (6) Fraudulent Inducement; (7) Fraudulent

16   Omission or Concealment; (8) Fraudulent Misrepresentation; (9) Negligent Misrepresentation; and

17   (10) Quasi-Contract / Unjust Enrichment.

18                                        **PARTIES**

19         16.    Plaintiff Robin Humphrey is a natural person and citizen of California who resides in

20   Clearlake, California.  Ms. Humphrey has purchased the Products numerous times from her local

21   Walmart, including as recently as July 2022.  Prior to her purchase, Ms. Keene reviewed the labeling,

22   packaging, and marketing materials of the products and saw the false and misleading claims that,

23   among other things, the Products are healthful for animal consumption.  Ms. Humphrey understood

24   these claims to be representations and warranties by Defendant, that the Products are free from

25   harmful ingredients.  Ms. Humphrey reasonably relied on these representations and warranties in

26   deciding to purchase the Products, and these representations were part of the basis of the bargain in

27   that she would not have purchased the Products or would not have purchased them on the same terms,

28   if the true facts about their contents had been known.  As a direct result of Defendant's material

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                3

misrepresentations and omissions, Ms. Humphrey suffered, and continues to suffer, economic injuries.

17.     Ms. Humphrey remains interested in purchasing pet food made by Defendant that is safe for consumption.  However, Plaintiff Humphrey is unable to determine if the Products are actually healthful for consumption.  Plaintiff understands that the composition of the Products may change over time.  But so long as Defendant may market the Products as healthful for consumption when the Products are not healthful and pose health risks, then when presented with false or misleading information when shopping, she will be unable to make informed decisions about whether to purchase Defendant's Products and will be unable to evaluate the different prices between Defendant's Products and competitor's Products.  Plaintiff is further likely to be repeatedly misled by Defendant's conduct, unless and until Defendant is compelled to ensure that Products marketed and labeled as healthful for consumption, are, in fact, healthful for consumption.

18.     Defendant The J.M. Smucker Co., d/b/a 9Lives, Kibbles 'n Bits, and Meow Mix, is a corporation with its headquarters located at 4400 Easton Commons Way, Suite 125, Columbus, Ohio 43219.  Relevant to Plaintiff's claim herein, Defendant is a leading manufacturer, packager, and distributor of pet food.  Defendant has done business throughout California and the United States at all times during the Class Period.  At all relevant times, Defendant has advertised, marketed, manufactured, distributed, and/or sold pet food, including the Products at issue, to consumers in and throughout California and the United States.  At all relevant times, Defendant formulated, directed, controlled, had the authority to control, and/or participated in the acts and practices set forth in this Complaint.

19.     Plaintiff reserves the right to amend this Complaint and add different products and additional defendants, including without limitation and officer, director, employee, supplier, or distributor of Defendant who has knowingly and willfully aided, abetted, and/or conspired in the false and deceptive conduct alleged herein.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), as amended by the Class Action Fairness Act of 2005 ("CAFA"), because this case is a class action

1    where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00,

2    exclusive of interest and costs, there are over 100 members of the putative class, and Plaintiff, as

3    well as most members of the proposed class, are citizens of different states than Defendant.  This

4    Court also has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

5           21.    This Court has personal jurisdiction over Defendant because Defendant purposefully

6    availed itself of this forum by conducting substantial business within California such that Defendant

7    has significant, continuous, and pervasive contacts with the State of California.

8           22.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant does

9    substantial business in this District and a substantial part of the events giving rise to Plaintiff's claims

10   took place within this District and Plaintiff saw and heard Defendant's advertisements in this District.

11                              **FACTUAL ALLEGATIONS**

12   **A.    The Presence of TiO2 Renders Healthful Representations Misleading**

13          23.    Titanium dioxide ("TiO2") is an inorganic compound that is easily powdered and pure

14   white in color.  Because of this property, it is relied upon heavily as a pigment in a variety of

15   applications including paint, sunscreen, and food coloring.  When used as a food colorant it is known

16   as E171.

17          24.    The food industry used TiO2 ubiquitously for over 30 years, but in the last decade

18   research began to call its fitness for consumption into serious question, and responsible food makers

19   have reacted accordingly.

20          25.    As early as 2014, big players in the food and confections market began to alert the

21   public of their intention to remove TiO2 from its confectionary products for consumption.  For

22   example, in response to one company's announcement that it would remove TiO2 from its products,

23   Jaydee Hanson, Senior Policy Analyst at Center for Food Safety, stated that "Studies have shown

24   that the human health risks associated with ingesting nanoparticles of many common food additives

25   far outweigh any utility for producers.  There are plenty of non-toxic alternatives available and we

26   urge [] others to commit to not using any engineered nanomaterials in human and animal food

27   products."

28

26.     The reason for eliminating titanium dioxide is simple: research has shown that TiO2 can pass through biological membranes, circulate through the body, and enter cells.  These properties mean it can have seriously detrimental health effects including DNA and chromosomal damage, organ damage, inflammation, brain damage, genital malformations, lesions in the liver and kidneys, and cell neurosis.  Titanium dioxide also builds up in the body's intestinal tract.  Ordinarily, the intestinal track is where nutrients are absorbed into the bloodstream.  However, titanium dioxide cannot be absorbed.  When this occurs, the body's M-Cells absorb these particles and bring them to the innate immune system.  Over time, the titanium dioxide particles are incorporated by the innate immune system cells where they will remain without being degraded or dissolved.

27.     In 2019, the French government responded to these troubling findings by banning all foods containing titanium dioxide.  In October 2020, the European Parliament removed titanium dioxide from the list of food additives authorized by the European Union for human consumption. European researchers studying titanium dioxide noted that the long half-lives of titanium dioxide nanoparticles created the potential for the particles to accumulate inside human organs and tissue. European researchers also determined that titanium dioxide nanoparticles could cause DNA strands to break, leading to chromosomal damage.

28.     These health concerns and government actions are not limited to human foods.  In November 2018, Petco—North America's second-largest pet supplies chain—announced its intention to pull all dog and cat food and treats that contain harmful artificial ingredients, including TiO2.  This decision, to remove harmful foods and treat from store shelves and ecommerce, was completed by May 2019.  Petco explained its decision reflects veterinarian recommendations and consumer preferences.  Petco cited a survey that shows a majority of veterinarians agree that pet owners should actively seek out foods with no artificial flavors, no artificial colors, and no artificial preservatives.  The same survey showed that a noteworthy 87% of pet owners believe it is important to their pets' health and well-being to serve food to their pets that is free of harmful ingredients.

29.     Titanium dioxide creates risks due to genotoxicity, the ability of a substance to damage DNA, the genetic material of cells.  When orally ingested, TiO2 particles can accumulate in the body.

30.     More recently, in 2021, the European Food Safety Authority ("EFSA") announced that $TiO_2$ can no longer be considered safe for consumers or animals when used as an additive in animal feed.  The EFSA specifically raised concerns about genotoxicity.

31.     Accordingly, in November 2021, the European Commission banned the use of $TiO_2$ as an additive in animal food.

**B.     The Presence of PFAS Renders Healthful Representations Misleading**

32.     Research by the Environmental Working Group ("EWG") showed that Defendant's Products contain heightened levels of organic fluorine indicative of PFAS (measure in parts per million), as well as various named PFAS (measured in parts per billion).

33.     EWG commissioned an independent laboratory to conduct total fluorine tests, as well as tests for specific PFAS.  EWG tested various pet food products, including two of Defendant's Products.[4]  A total fluorine test presents a scientifically valid method of testing for PFAS used by both the food industry and researchers.

34.     All PFAS contain organic fluorine and there are few other sources of the compound. Accordingly, the packaging industry has adopted total fluorine tests to assess a material's total PFAS content.   For example, the Biodegradable Products Institute ("BPI") has adopted 100ppm as a threshold.  Amounts over 100 ppm are considered indicative of intentional use of PFAS.

35.     Scientists have also acknowledged that total fluorine test represent a scientifically valid method of testing for PFAS.  Indeed, Rainier Lohmann, Director of University of Rhode Island's Lohmann Lab has explained that "[i]f a product is showing really high fluorine levels, companies really can't claim they didn't use PFAS."

36.     The laboratory results showed that Meow Mix Tender Centers contained 630 ppm and named PFAS in the amount of 5 ppb and that Kibbles 'n Bits Bacon & Steak contained 590 ppm and named PFAS in the amount of 14.3 ppb.

---

[4] Defendant relies on many of the same suppliers for each of the Products' packaging and has not substantially or meaningfully altered its suppliers for the Products' packaging for several years.  In addition, Defendant has not substantially or meaningfully altered the components comprising the Products' packaging within the past several years.  Because the packaging for the Products is comprised of similar and unaltered components, some has tested for PFAS it is highly likely that the packaging of each of Defendant's Products are also comprised of certain named PFAS.

37.     Unlike the products offered by Defendant's competitors, Defendant's Products contained the highest levels of total fluorine indicating PFAS. With the exception of a single product, each of the other competitor products tested by the laboratory showed amounts of fluorine below the threshold for intentional use of fluorine, which is 100 ppm.

38.     Researchers have established with certainty that chemicals migrate from food contact articles onto food. Scientists have studies this phenomenon for decades and describe it as "migration." Because PFAS are incredibly mobile, they readily migrate into food.

39.     Scientists are incredibly concerned about the health risks raised by PFAS. All PFAS share a concerning structural feature, specifically the presence of perfluoralkyl moieties, which results in their shared resistance to metabolic degradation. As PFAS persist and mix with other substances, there is an increased exposure for health effects.

40.     Indeed, animal studies have found that PFAS can cause, among other serious health effects, damage to the liver and immune system, various cancers, such as kidney and testicular concerns, and increased cholesterol levels.

41.     Research shows that there is a reduced latency period for pets and such health risks may materialize in a matter of a few years given pets' shorter lifespan.

C.     **Defendant's Misrepresentations and Omissions are Actionable**

42.     Defendant has endangered consumers' pets, exposing them to TiO2 and PFAS, which Defendant knows carries significant health concerns. Despite the fact that the Products contain the harmful ingredient, Defendant represents that the Products are healthful for animals.

43.     On the 9Lives cat food packaging, Defendant represents that it has been "caring for cats since 1959." Specifically, Defendant represents that the Product provides "Daily Essentials" with "balanced nourishment in each tasty bite!" Defendant represents that the pet food will build "strong muscles," enable "healthy heart and vision," and produce "healthy skin & coat."

1

2

3

4

5

6

7

8

9



10        44.      On the Kibbles 'n Bits dog food packaging, Defendant represents that the food is

11    "100% Complete and Balanced Nutrition for Adult Dogs."  Defendant ensures that there is "balanced

12    nourishment in every bite!"

13

14

15

16

17

18

19

20

21

22

23

24

25

26



27        45.      On the Meow Mix cat food packaging, Defendant represents that it is intended for

28    cats' "indoor health."  Defendant further represents that the Product is "100% complete and balanced

nutrition for adult cats," it has "all essential vitamins & minerals" and it "helps maintain healthy weight."




46.     Each of these statements represent pure and partial omissions as well as misrepresentations regarding the Product's healthfulness to pets.  As a result, Plaintiff and the Class were injured by the full purchase price of the Products because the Products are worthless, as they are marketed as healthful for animal consumption.

47.     Plaintiff and Class Members bargained for products that are healthful for consumption and were deprived of the basis of their bargain when Defendant sold them Products in packaging containing substances heightening the risks of serious negative health effects.

48.     No reasonable consumer would expect that the Products marketed as healthful for animal consumption would pose a risk to their pets' health, safety, and well-being, or that they would contain TiO2 or PFAS, both of which are linked to harmful health effects.  Accordingly, Plaintiff and Class Members suffered economic injuries as a result of purchasing the Products.

49.     Moreover, because these facts relate to a critical safety-related deficiency in the Products, Defendant was under a continuous duty to disclose to Plaintiff and Class Members the true

standard, quality, and grade of the Products and to disclose that the Products contained substances known to have adverse health effects. Defendant also had a duty to disclose because of its exclusive and/or superior knowledge concerning the true nature of the Products. Nonetheless, Defendant concealed and misrepresented this information, as discussed herein.

50. Although Defendant is in the best position to know what content it placed on its packaging during the relevant timeframe, and the knowledge that Defendant had regarding the presence of TiO2 and PFAS that rendered its representations misleading, to the extent necessary, Plaintiff satisfies the requirements of Rule 9(b) by alleging the following facts with particularity:

51. **WHO**: Defendant made material misrepresentations and omissions of fact about the Products through its labeling which shows that the Products are healthful. These representations constitute omitted material information regarding harmful chemicals.

52. **WHAT**: Defendant's conduct here was, and continues to be, fraudulent because it omitted and concealed that the Products contain TiO2 and PFAS—which are widely known to have significant health repercussions. Thus, Defendant's conduct deceived Plaintiff and Class Members into believing that the Products are healthful for animal consumption when they are not. Defendant knew or should have known that this information is material to reasonable consumers, including Plaintiff and Class Members in making their purchasing decisions, yet they continued to pervasively market the Product in this manner in the U.S. market to convince consumers the Products are healthful for pets.

53. **WHEN**: Defendant made material misrepresentations and omissions during the putative class periods, including prior to and at the time Plaintiff and Class Members purchased the Products, despite its knowledge that the Products' packaging contained TiO2 and PFAS, harmful substances with known adverse health effects.

54. **WHERE**: Defendant's marketing message was uniform and pervasive, carried through material misrepresentations and omissions on the labeling of the Product's packaging, website, and through marketing materials.

55. **HOW**: Defendant made material misrepresentations and omissions of fact regarding the Products, including the presence of TiO2 and PFAS in the Products.

56.     **WHY**:   Defendant  made  the  material  misrepresentations  and  omissions  detailed herein for the express purpose of inducing Plaintiff, Class Members, and all reasonable consumers to purchase and/or pay for the Products, the effect of which was that Defendant profited by selling the Products to hundreds of thousands of consumers.

57.     **INJURY**:  Plaintiff and Class Members purchased, paid a premium (up to the full-price),  or  otherwise  paid  more  for  the  Products  when  they  otherwise  would  not  have  absent Defendant's misrepresentations and omissions.

## CLASS ALLEGATIONS

58.     ***Class Definition.***  Plaintiff brings this action on behalf of a class of similarly situated individuals,  defined  as  all  persons  in  the  United  States  who,  within  the  applicable  statute  of limitations period, up to and including the date of final judgement in this action, purchased any of Defendant's Products at issue (the "Class").

(a)     ***California Subclass.***  Plaintiff Humphrey also seeks to represent a subclass of all Class members who within the applicable statutes of limitations period, up to and including the date of final judgement in this action, purchased any of the Products at issue in California (the "California Subclass").

59.     Excluded from the Class and Subclasses are persons who made such purchase for purpose of resale, Defendant and any entities in which Defendant has a controlling interest, Defendant's agents and employees, the judge to whom this action is assigned, and members of the judge's staff, and the judge's immediate family.

60.     Plaintiff reserves the right to amend the definition of the Class and Subclass if discovery or further investigation reveals that the Class or Subclass should be expanded or otherwise modified.

61.     ***Numerosity.***  Members of the Class and Subclass are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Class and Subclass number in the millions.  The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined though discovery.  Class members may be

notified of the pendency of this action by mail and/or publications through the distribution records of Defendant and third-party retailers and vendors.

62.     ***Commonality and Predominance.***  Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Common legal and factual questions include but are not limited to: whether Defendant warranted the Products as "Safe for Animal Consumption"; whether the Products contain Titanium Dioxide; whether Defendant breached these warranties; and whether Defendant committed the statutory and common law violations alleged against them herein by doing so.

63.     ***Typicality.***  Plaintiff Humphrey's claims are typical of the claims of the Class in that Plaintiff purchased one of Defendant's Products in reliance on the presentations and warranties described above and suffered a loss as a result of that purchase.

64.     ***Adequacy.***  Plaintiff Humphrey is an adequate representative of the Class and respective Subclass because her interest does not conflict with the interests of the Class and Subclass members she seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously.  The interests of the Class and Subclass members will be fairly and adequately protected by Plaintiff and her counsel.

65.     ***Superiority.***    The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members.  Individually, the Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense of all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of the case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issue will ensure that all claims and claimants are before this Court for consistent adjudication of liability issues.

66.     Defendant has acted or failed to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class and Subclass as a whole.

67.     Without a class action, Defendant will continue a course of action that will result in further damages to Plaintiff and members of the Class and Subclass and will likely retain the benefits of its wrongdoing.

68.     Based on the foregoing allegations, Plaintiff's claims for relief include those set forth below.

**COUNT I**
**(Violation of California's Unfair Competition Law,**
**Cal. Bus. & Prof. Code §§ 17200, *et seq*.)**

69.     Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

70.     Plaintiff brings this claim individually and on behalf of the California Subclass against Defendant.

71.     California Business and Professions Code § 17200 prohibits "any unlawful, unfair, or fraudulent business act or practice."  For the reasons discussed above, Defendant has engaged in unlawful, unfair, and fraudulent business acts or practices in violation of California Business & Professions Code § 17200.

72.     By committing the acts and practices alleged herein, Defendant has violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200-17210, as to the California Subclass, by engaging in unlawful, fraudulent, and unfair conduct.

73.     Defendant has violated the UCL's proscription against engaging in **Unlawful Business Practices** as a result of its violations of the CLRA, Cal. Civ. Code § 1770(a)(5), (a)(7), and (a)(9) as alleged below, violations of California's False Advertising Law, in addition to violations of common law.

74.     As more fully described above, Defendant's misleading marketing, advertising, packaging, and labeling of the Products are likely to deceive reasonable consumers.  In addition, Defendant has committed unlawful business practices by, inter alia, making the representations and omissions of material facts, as set forth more fully herein, and violating the common law.

75.     Plaintiff and the California Subclass Members reserve the right to allege other violations of law which constitute other unlawful business acts or practices.

76.     Defendant has also violated the UCL's proscription against engaging in **Unfair Business Practices**.  Defendant's acts, omissions, misrepresentations, practices and non-disclosures as alleged herein also constitute "unfair" business acts and practices within the meaning of Business & Professions Code § 17200 *et seq*. in that its conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

77.     There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein as noted above.

78.     Defendant has further violated the UCL's proscription against engaging in **Fraudulent Business Practices**.  Defendant's claims, nondisclosures and misleading statements with respect to the Products, as more fully set forth above, were false, misleading and/or likely to deceive the consuming public within the meaning of Business & Professions Code § 17200.

79.     Plaintiff and the other California Subclass Members suffered a substantial injury by virtue of buying the Products that they would not have purchased absent Defendant's unlawful, fraudulent, and unfair marketing, advertising, packaging, and omission about the defective nature of the Products.

80.     There is no benefit to consumers or competition from deceptively marketing and omitting material facts about the true nature of the Products.

81.     Plaintiff and the other California Subclass Members had no way of reasonably knowing that the Products they purchased were not as marketed, advertised, packaged, or labeled. Thus, they could not have reasonably avoided the injury each of them suffered.

82.     The gravity of the consequences of Defendant's conduct as described outweighs any justification, motive, or reason therefore, particularly considering the available legal alternatives which exist in the marketplace, and such conduct is immoral, unethical, unscrupulous, offends established public policy, or is substantially injurious to Plaintiff and the other California Subclass Members.

83.     Pursuant to California Business and Professional Code § 17203, Plaintiff and the California Subclass seek an order of this Court that includes, but is not limited to, an order requiring Defendant to (a) provide restitution to Plaintiff and the other California Subclass Members; (b) disgorge all revenues obtained as a result of violations of the UCL; and (c) pay Plaintiff's and the California Subclass' attorneys' fees and costs.

**COUNT II**
**(Violation of California's Consumers Legal Remedies Act ("CLRA"),**
**California Civil Code § 1750, *et seq.*)**
**(Injunctive Relief Only)**

84.     Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

85.     Plaintiff brings this claim individually and on behalf of the California Subclass against Defendant.

86.     Civil Code § 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have."

87.     Civil § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."

88.     Civil § 1770(a)(9) prohibits "advertising goods or services with intent not to sell them as advertised."

89.     Defendant violated Civil Code § 1770(a)(5), (a)(7), and (a)(9) by holding out the Products as healthful when in fact the Products are not healthful.

90.     The Products are not healthful because they contain TiO2 and PFAS.

91.     Defendant has exclusive and/or superior knowledge of the health risks of the Product, which was not known to Plaintiff or California Subclass Members.

92.     Defendant made partial representations to Plaintiff and California Subclass Members, while suppressing the true nature of the Products.  Specifically, by displaying the Products and describing the Products as healthful, including on the product packaging, on its website, and in its marketing, without disclosing that the Products were harmful to animal health.  Moreover, Defendant

affirmatively misrepresented the Products despite its knowledge that the Products were not as advertised.

93.     Plaintiff and the California Subclass Members have suffered harm as a result of these violations of the CLRA because they have incurred charges and/or paid monies for the Products that they otherwise would not have incurred or paid, and were unknowingly exposed to a significant and substantial health risk.

94.     On August 26, 2022, prior to the filing of this Complaint, Plaintiff's counsel sent Defendant a CLRA notice letter, which complies in all respects with California Civil Code § 1782(a). The letter was sent via certified mail, return receipt requested, advising Defendant that it was in violation of the CLRA with respect to the presence of TiO2 in the Products, and demanding that they cease and desist from such violations and make full restitution by refunding the monies received therefrom.  The letter stated that it was sent on behalf of all other similarly situated purchasers. Because of the gravity of the harm alleged, Plaintiff has chosen not to wait for Defendant's response. Plaintiff has also chosen not to wait for Defendant's response because Defendant has long known about its conduct as described herein.  Accordingly, Plaintiff's letter would not have served the purpose of the letter.

95.     Accordingly, Plaintiff and the California Subclass Members seek injunctive relief available under the CLRA.  Should Defendant choose not to remedy the situation within 30 days of the letter, Plaintiff reserves the right to amend this complaint for damages and reasonable attorney's fees.

## COUNT III
### (Violation of California's False Advertising Law,
### Cal. Bus. & Prof. Code § 17500, *et seq.*)

96.     Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

97.     Plaintiff brings this claim individually and on behalf of the California Subclass against Defendant.

98.     Defendant's acts and practices, as described herein, have deceived and/or are likely to continue to deceive Class Members and the public.  As described above, and throughout this

Complaint, Defendant misrepresented the Products as healthful when, in fact, the Products were not healthful and instead heighten health risks.

99.    By its actions, Defendant disseminated uniform advertising regarding the Products to and across California.   The advertising was, by its very nature, unfair, deceptive, untrue, and misleading within the meaning of Cal. Bus. & Prof. Code § 17500, *et seq*.  Such advertisements were intended to and likely did deceive the consuming public for the reasons detailed herein.

100.    The above-described false, misleading, and deceptive advertising Defendant disseminated continues to have a likelihood to deceive in that Defendant failed to disclose that the Products contain substances that pose a significant risk to the health and wellbeing of animals, as well as to the environment.

101.    Defendant continues to misrepresent to consumers that the Products was healthful when its fact the Products are not.  However, as described, this is not the case.

102.    In making and disseminating these statements, Defendant knew, or should have known, its advertisements were untrue and misleading in violation of California law.  Plaintiff and other Class Members based their purchasing decisions on Defendant's omitted material facts.  The revenue attributable to the Products sold in those false and misleading advertisements likely amounts to tens of millions of dollars.  Plaintiff and Class Members were injured in fact and lost money and property as a result.

103.    The misrepresentations and non-disclosures by Defendant of the material facts described and detailed herein constitute false and misleading advertising and, therefore, constitutes a violation of Cal. Bus. & Prof. Code § 17500, *et seq*.

104.    As a result of Defendant's wrongful conduct, Plaintiff and Class Members lost money in an amount to be proven at trial.  Plaintiff and Class Members are therefore entitled to restitution as appropriate for this cause of action.

105.    Plaintiff and Class Members seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Defendant's unfair, unlawful, and fraudulent business practices; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT IV
### (Fraud)

106.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

107.    Plaintiff brings this claim individually and on behalf of the Class.

108.    At the time Plaintiff and Class Members purchased the Products, Defendant did not disclose, but instead concealed and misrepresented, the Products as healthful.

109.    Defendant affirmatively misrepresented the Products, giving the Products the appearance of a product that is indeed healthful.

110.    Defendant also knew that its omissions and misrepresentations regarding the Products were material, and that a reasonable consumer would rely upon Defendant's representations (and corresponding omissions) in making purchasing decisions.

111.    Plaintiff and Class Members did not know—nor could they have known through reasonable diligence—about the true nature of the Products.

112.    Plaintiff and Class Members would have been reasonable in relying on Defendant's misrepresentations (and corresponding omissions) in making their purchasing decisions.

113.    Plaintiff and Class Members had a right to reply upon Defendant's representations (and corresponding omissions) as Defendant maintained monopolistic control over knowledge of the true quality of the Products.

114.    Plaintiff and Class Members sustained damages as a result of their reliance on Defendant's omissions and misrepresentations, thus causing Plaintiff and Class Members to sustain actual losses and damages in a sum to be determined at trial, including punitive damages.

## COUNT V
### (Constructive Fraud)

115.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

116.    Plaintiff brings this claim individually and on behalf of the Class.

117.    At the time Plaintiff and Class Members purchased the Products, Defendant did not disclose, but instead concealed and misrepresented, the Products as discussed herein.

118.    Defendant affirmatively misrepresented the Products, giving the Products the appearance of a product that is indeed healthful.

119.    Defendant also knew that its omissions and misrepresentations regarding the Products were material, and that a reasonable consumer would rely upon its representations (and corresponding omissions) in making purchasing decisions.

120.    Defendant had an obligation not to omit or misrepresent the Products because in addition to the fact that the Products pertained to matters of safety: (a) it was in the sole possession of such information; (b) it made partial representations regarding the quality of the Products; (c) Plaintiff and the Class Members relied upon Defendant to make full disclosures based upon the relationship between Plaintiff and Class Members, who relied on Defendant's representations and omissions, and were reasonable in doing so, with the full knowledge of Defendant that it did and would have been reasonable in doing so.

121.    Plaintiff and Class Members did not know—nor could they have known through reasonable diligence—about the true quality of the Products.

122.    Plaintiff and Class Members would have been reasonable in relying on Defendant's misrepresentations (and corresponding omissions) in making their purchasing decisions.

123.    Plaintiff and Class Members had a right to rely upon Defendant's representations (and corresponding omissions) as, in addition to the fact that the issue pertained to safety, Defendant maintained monopolistic control over knowledge of the true quality of the Products, and what information was available regarding the Products.

124.    Defendant breached its duty to Plaintiff and Class Members to make full disclosures of the safety of their Products.

125.    Plaintiff and Class Members sustained damages as a result of their reliance on Defendant's omissions and misrepresentations, and Defendant's breach of its duty, thus causing Plaintiff and Class Members to sustain actual losses and damages in a sum to be determined at trial.

///

///

///

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT VI
### (Fraudulent Inducement)

126.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

127.    Plaintiff brings this claim individually and on behalf of the Class.

128.    Defendant did not disclose, but instead concealed and misrepresented, the Products as discussed herein.

129.    Defendant knew, or should have known, that the Products were falsely portrayed and that knowledge of the safety-related issues discussed throughout was withheld from the consumer public.

130.    Defendant also knew that its omissions and misrepresentations regarding the Product were material, and that a reasonable consumer would rely on Defendant's representations (and corresponding omissions) in making purchasing decision.

131.    Plaintiff and Class Members did not know—nor could they have known through reasonable diligence—about the true quality of the Products.

132.    Plaintiff and Class Members would have been reasonable in relying on Defendant's misrepresentations (and corresponding omissions) in making their purchasing decisions.

133.    Plaintiff and Class Members had a right to rely on Defendant's representations (and corresponding omissions) as Defendant maintained a monopolistic control over the Products, and what information was available regarding the Products.

134.    Defendant intended to induce—and did, indeed, induce—Plaintiff and Class Members into purchasing the Products based upon its affirmative representations and omissions.

135.    Plaintiff and Class Members sustained damages as a result of their reliance on Defendant's omission and misrepresentations, thus causing Plaintiff and Class Members to sustain actual losses and damages in a sum to be determined at trial.

## COUNT VII
### (Fraudulent Concealment or Omission)

136.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

137.    Plaintiff brings this claim individually and on behalf of the Class.

1    138.    At all relevant times, Defendant was engaged in the business of designing,

2    manufacturing, distributing, and selling the Products.

3    139.    Defendant, acting through its representatives or agents, delivered the Products to its

4    own distributors and various other distribution channels.

5    140.    Defendant willfully, falsely, and knowingly omitted material facts and made partial

6    representations regarding the quality and character of the Products as discussed throughout.

7    141.    Rather than inform consumers of the truth regarding the Products, Defendant

8    misrepresented the quality of the Products as discussed herein at the time of purchase.

9    142.    Defendant made these material omissions and partial representations to boost or

10   maintain sales of the Products, and to falsely assure purchasers of the Products that Defendant is a

11   reputable company and that its Products are healthful.   The omitted information and partial

12   representations were material to consumers because the representations played a significant role in

13   the value of the Products purchased.

14   143.    Plaintiff and Class Members accepted the terms of use, which were silent on the true

15   nature of the Products, as discussed throughout.  Plaintiff and Class Members had no way of knowing

16   that Defendant's misrepresentations as to the Products, and had no way of knowing that Defendant's

17   misrepresentations were misleading.

18   144.    Although Defendant had a duty to ensure the accuracy of the information regarding

19   the Products because its was in exclusive knowledge of this information, the information pertains to

20   matters of health, and Defendant made partial representations.  But it did not fulfill that duty.

21   145.    Defendant misrepresented material facts partly to pad and protect its profits, as it saw

22   that profits and sales of the Products were essential for its continued growth and to maintain and

23   grow its reputation as a premier designer and vendor of the Products.  Such benefits came at the

24   expense of Plaintiff and Class Members.

25   146.    Plaintiff and Class Members were unaware of these material misrepresentations, and

26   they would not have acted as they did had they known the truth.  Plaintiff's and class members'

27   actions were justified given Defendant's misrepresentations.  Defendant was in the exclusive control

28   of material facts, and such facts were not known to the public.

147.     Due to Defendant's misrepresentations, Plaintiff and Class Members sustained injury due to the purchase of the Products that did not live up to their advertised representations.  Plaintiff and Class Members are entitled to recover full refunds for the Products they purchased due to Defendant's misrepresentations.

148.     Defendant's acts were done maliciously, oppressively, deliberately, and with intent to defraud, and in reckless disregard of Plaintiff, and Class Members' rights and well-being, and in part to enrich itself at the expense of consumers.  Defendant's acts were done to gain commercial advantage over competitors, and to drive consumers away from consideration of competing products. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

## COUNT VIII
### (Fraudulent Misrepresentation)

149.     Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

150.     Plaintiff brings this claim individually and on behalf of the Class.

151.     Defendant falsely represented to Plaintiff and the Class that the Products were healthful.

152.     Defendant intentionally, knowingly, and recklessly made these misrepresentations to induce Plaintiff and the Class to purchase the Products.

153.     Defendant knew or should have known that its representations about the Products were false in that the Products are not healthful as discussed throughout.  Defendant knowingly allowed its packaging, labels, advertisements, promotional materials, and websites to intentionally mislead consumers, such as Plaintiff and the Class.

154.     Plaintiff and the Class did in fact rely on these misrepresentations and purchased the Products to their detriment.  Given the deceptive manner in which Defendant advertised, marketed, represented, and otherwise promoted the Products, Plaintiff's and the Class's reliance on Defendant's misrepresentations was justifiable.

155.     As a direct and proximate result of Defendant's conduct, Plaintiff and the Class have suffered actual damages in that they would not have purchased the Products at all had they known

of the safety risks associated with the Products and that they do not conform to Defendant's advertising and marketing.

156.    Plaintiff and the Class seek actual damages, attorney's fees, costs, and other such relief the Court deems proper.

**COUNT IX**
**(Negligent Misrepresentation)**

157.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

158.    Plaintiff brings this claim individually and on behalf of the Class.

159.    Defendant had a duty to Plaintiff and the Class to exercise reasonable and ordinary care in the developing, testing, manufacture, marketing, detailing, distribution, and sale of the Products.

160.    Defendant breached its duty to Plaintiffs and the Class by developing, testing, manufacturing, marketing, detailing, distributing, and selling the Products to Plaintiff and the Class that did not have the qualities, characteristics, and suitability for use as advertised by Defendant and by failing to promptly remove the Products from the marketplace or take other appropriate remedial action.

161.    Defendant knew or should have known that the qualities and characteristics of the Products were not as advertised, marketed, detailed, or otherwise represented or suitable for its intended use and were otherwise not as warranted and represented by Defendant.  Specifically, Defendant knew or should have known that the Product was not healthful and raised health risks.

162.    As a direct and proximate result of Defendant's conduct, Plaintiff and the Class have suffered actual damages in that they would not have purchased the Products at all had they known that the Products were not healthful and that the Products do not conform to the Product's labeling, packaging, advertising, and statements.

163.    Plaintiff and the Class seek actual damages, attorney's fees, costs, and any other just and proper relief available.

**COUNT X**
**(Quasi-Contract / Unjust Enrichment)**

164.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

165.    Plaintiff brings this claim individually and on behalf of the Class.

166.    To the extent required by law, this cause of action is alleged in the alternative to legal claims, as permitted under Fed. R. Civ. P. 8.

167.    Plaintiff and Class Members conferred benefits on Defendant by purchasing the Products.

168.    Defendant was unjustly enriched in retaining the revenues derived from Plaintiff and Class Members' purchases of the Products.  Retention of those moneys under these circumstances is unjust and inequitable because Defendant failed to disclose that the Products were not healthful as advertised, rendering them unfit for their intended purpose.  These omissions caused injuries to Plaintiff and Class Members because they would not have purchased the Product if the true facts were known.

169.    Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiff and Class Members is unjust and inequitable, Defendant has been unjustly enriched in an amount to be determined at trial.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a)    For an order certifying the Class under Fed. R. Civ. P. 23 and naming Plaintiff as representatives of the Class and the California Subclass and Plaintiff's attorneys as Class Counsel;

(b)    For an order declaring the Defendant's conduct violates the statutes referenced herein;

(c)    For an order finding in favor of Plaintiff, the Class, and the California Subclass on all counts asserted herein;

(d)    For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

(e)    For prejudgment interest on all amounts awarded;

(f)    For an order of restitution and all other forms of equitable monetary relief;

(g)     For injunctive relief as pleaded or as the Court may deem proper;

(h)     For an order awarding Plaintiff and the Class and California Subclass their reasonable attorneys' fees and expenses and costs of suit.

### JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.


Dated:  November 4, 2022                     **BURSOR & FISHER, P.A.**

                                             By:  ____/s/___*L. Timothy Fisher*_____
                                                          L. Timothy Fisher

                                             L Timothy Fisher (State Bar No. 191626)
                                             Sean L. Litteral (State Bar No. 331985)
                                             1990 North California Blvd., Suite 940
                                             Walnut Creek, CA 94596
                                             Telephone: (925) 300-4455
                                             Facsimile:  (925) 407-2700
                                             E-mail: ltfisher@bursor.com
                                                     slitteral@bursor.com

                                             **BURSOR & FISHER, P.A.**
                                             Jonathan L. Wolloch (*pro hac vice* forthcoming)
                                             701 Brickell Ave., Suite 1420
                                             Miami, FL 33131
                                             Telephone: (305) 330-5512
                                             Facsimile:  (305) 676-9006
                                             Email: jwolloch@bursor.com

                                             *Attorneys for Plaintiff*

**CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)**

I, L. Timothy Fisher, declare as follows:

1.      I am an attorney at law licensed to practice in the State of California and a member of the bar of this Court.  I am a partner at Bursor & Fisher, P.A., counsel of record for Plaintiff Humphrey.  Plaintiff Humphrey resides in Clearlake, California.  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify thereto under oath.

2.      The Complaint filed in this action is filed in the proper place for trial under Civil Code Section 1780(d) in that a substantial portion of the events alleged in the Complaint occurred in the forum, as Defendant intentionally availed itself of this forum by conducting substantial business in this forum.

I declare under the penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct and that this declaration was executed at Walnut Creek, California this 4th day of November, 2022.


    */s/ L. Timothy Fisher*
      L. Timothy Fisher