**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Emily A. Horne (State Bar No. 347723)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
   ehorne@bursor.com

**BURSOR & FISHER, P.A.**
Jonathan L. Wolloch (admitted *pro hac vice*)
701 Brickell Avenue, Suite 1420
Miami, FL 33131
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
E-mail: jwolloch@bursor.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBIN HUMPHREY, individually and on behalf of all others similarly situated,<br><br>          Plaintiff,<br><br> v.<br><br>THE J.M. SMUCKER COMPANY and POST CONSUMER BRANDS LLC.<br><br>          Defendants. | Case No. 3:22-CV-06913-WHO<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff Robin Humphrey ("Plaintiff") brings this action on behalf of herself and all others similarly situated against Defendants The J.M. Smucker Company ("Defendant J.M. Smucker") and Post Consumer Brands LLC ("Defendant Post Consumer Brands") (collectively, "Defendants"). Plaintiff makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to the allegations specifically pertaining to herself, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      Plaintiff brings this Class action lawsuit on behalf of herself and similarly situated consumers ("Class Members") who purchased 9Lives-branded pet food,[1] Kibbles 'n Bits-branded pet food,[2] and Meow Mix-branded pet food[3] (the "Products"), which are misleadingly labeled as healthful despite containing titanium dioxide ("TiO2" or the "Additive").  Worse, the packaging of Defendants' products—which is essential and integral to delivering the food to consuming pets— also contain (or risk containing) per-and polyfluoroalkyl substances ("PFAS"), which are synthetical chemicals that pose undue health risks further rendering Defendants' healthful representations false and misleading.

2.      Defendants have known of the health problems posed by TiO2 since at least February 2014 when big players in the food market publicly announced they would no longer use the additive in products due to health concerns.  These announcements have been widely reported on by several news outlets, including Time Magazine, CNN, The Guardian, and the Los Angeles Times.

3.      Major retailers of pet food, including retailers that at one time offered brands by Defendants, also announced that they would not sell pet food containing TiO2.

---

[1] Those products include, but are not limited to, substantially similar products, including all flavors of 9Lives: Daily Essentials, Indoor Complete, Seafood & Poultry Favorites, Plus Care.

[2] Those products include, but are not limited to, substantially similar products, including all flavors of Kibbles 'n Bits: Original, Bacon and Steak, Bistro, Mini Bits, Complete and Balanced, and Homestyle.

[3] Those products include, but are not limited to, substantially similar products, all flavors of Meow Mix: Original Choice, Tender Centers, Irresistible, Indoor Health, Seafood Medley, Bistro Recipes, and Ocean Explosion, amongst others.

4.     The industry announcements were informed by scientific research concluding that TiO2 is unhealthy and unsafe for consumption.

5.     Similarly, in light of the growing scientific research, several nations have banned TiO2 because of its toxicity.  For example, in 2019, TiO2 was banned in France for human consumption.  In May 2021, the European Food Safety Authority ("EFSA") released its report on the health concerns associated with TiO2, determining that TiO2 could not be considered safe for consumption for humans *or animals*.

6.     Professor Maged Younes, Chair of EFSA's expert Panel on Food Additives and Flavourings ("FAF") underscored these findings, stating that: "Taking into account all available scientific studies and data, the Panel concluded that titanium dioxide can no longer be considered safe as a food additive.  A critical element in reaching this conclusion is that we could not exclude genotoxicity concerns after consumption of titanium dioxide particles."

7.     Building on EFSA's research, the European Commission ("EC") announced that it too would adopt a ban on the use of TiO2 as a food additive.  The EC additionally announced it would adopt a ban on the use of TiO2 as a food additive for all animal species.

8.     Similarly, Defendants have long known of the health problems posed by PFAS, which persist and accumulate and are harmful even at very low levels.  PFAS have been shown to have a number of toxicological effects in laboratory studies as PFAS exposure raises a host of health effects, including but not limited to various cancers, liver damage, and immunotoxicity effects.

9.     Because of the concerns presented by TiO2 and PFAS, consumers, like Plaintiff and Class members, care about their presence, even if in small amounts.

10.     Defendants employ food scientists who focus on food safety and nutrition specifically for pet food products, including tracking industry developments concerning ingredients and additives.  Defendants also employ packaging engineers, scientists, and managers who focus on pet food products, including assessing suitability for direct food contact applications.

11.     Defendants nonetheless consistently make various misrepresentations concerning the Products to convince consumers that the Products are healthful for consumption and do not expose pets to heightened risk of a host of health effects from consuming Defendants' Products.

12.     Defendants knew or should have known that titanium dioxide is unhealthy and raises health risks from various sources, including but not limited to information provided by certain of its major retailers and its food scientists.

13.     Nonetheless Defendants sell pet food containing TiO2 and containing (or risk containing) PFAS, abusing the public's trust and failing to inform consumers of the implications of consuming the toxins.  Instead, Defendants rely on the ingredient list to make its only reference to TiO2, which is provided in tightly woven, miniscule block print on the back of the Products, which consumers are unlikely to notice.  In addition, Defendants nowhere inform consumers that the Products contain, or risk containing, PFAS.

14.     The inadequate labeling means that consumers who purchase Defendants' Products are unaware that their pets are at heightened risk of a host of health effects stemming from TiO2 and PFAS.

15.     Based on Defendants' omissions, a reasonable consumer would expect that the Products are healthful and can be purchased and consumed as marketed and sold.  However, the Products are not healthful and pose a significant health risk.  Yet, neither before nor at the time of purchase do Defendants notify consumers like Plaintiff that the Products are not healthful, pose health risks, and should otherwise be approached with caution.

16.     Accordingly, Plaintiff brings her claims against Defendants individually and on behalf of a class of all others similarly situated for (1) violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*; (2) violation of the Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*; (3) violation of California's False Advertising Law, Cal. Bus. & Prof. Code § 17200, *et seq.*; (4) Fraud; (5) Fraudulent Inducement; (6) Fraudulent Omission or Concealment; (7) Fraudulent Misrepresentation; (8) Negligent Misrepresentation; and (9) Quasi-Contract / Unjust Enrichment.

## PARTIES

17.     Plaintiff Robin Humphrey is a natural person and citizen of California who resides in Clearlake, California.  Ms. Humphrey has long been interested in providing her pets with healthful food that would not expose her pets to harmful chemicals or other substances.  Ms. Humphrey

specifically set out to purchase products with those characteristics. Ms. Humphrey did so because she cares about the presence of harmful substances even if in small amounts.

18.     Due to Ms. Humphrey's interest in doing so, Ms. Humphrey purchased 9Lives Indoor Complete, 9Lives Original, Kibbles 'n Bits Original, Kibbles 'n Bits Bistro, and Meow Mix Original Choice products. Her most recent purchase was from her local Walmart, in July 2022. Prior to her purchase, Ms. Humphrey reviewed the labeling, packaging, and marketing materials of the products and saw the false and misleading claims that, among other things, the Products are healthful for animal consumption.

19.     Ms. Humphrey understood these claims to be representations and warranties by Defendants, that the Products are free from harmful ingredients and would indeed support—not detract—from the health of her pets. Ms. Humphrey reasonably relied on these representations and warranties in deciding to purchase the Products, and these representations were part of the basis of the bargain in that she would not have purchased the Products or would not have purchased them on the same terms, if the true facts about their contents had been known. As a direct result of Defendants' material misrepresentations and omissions, Ms. Humphrey suffered, and continues to suffer, economic injuries.

20.     Ms. Humphrey remains interested in purchasing pet food made by Defendants that is healthful for her pets and safe for consumption. However, Plaintiff Humphrey is unable to determine if the Products are actually healthful for consumption. Plaintiff understands that the composition of the Products may change over time. But so long as Defendants may market the Products as healthful for consumption when the Products are not healthful and pose health risks, then when presented with false or misleading information when shopping, she will be unable to make informed decisions about whether to purchase Defendants' Products and will be unable to evaluate the different prices between Defendants' Products and competitor's Products. Plaintiff is further likely to be repeatedly misled by Defendants' conduct, unless and until Defendants are compelled to ensure that Products marketed and labeled as healthful for consumption, are, in fact, healthful for consumption.

21.     Defendant J.M. Smucker, is a corporation with its headquarters located at 4400 Easton Commons Way, Suite 125, Columbus, Ohio 43219. Relevant to Plaintiff's claim herein, Defendant

J.M. Smucker is a leading manufacturer, packager, and distributor of pet food.  Defendant J.M. Smucker has done business throughout California and the United States at all times during the Class Period.  At all relevant times, Defendant J.M. Smucker has advertised, marketed, manufactured, distributed, and/or sold the Meow Mix Products at issue, to consumers in and throughout California and the United States.  In addition, at all relevant times prior to approximately May 2023, Defendant J.M. Smucker has advertised, marketed, manufactured, distributed, and/or sold the 9Lives and Kibbles 'n Bits Products at issue, to consumers in and throughout California and the United States. Defendant J.M. Smucker formulated, directed, controlled, had the authority to control, and/or participated in the acts and practices set forth in this Complaint.

22.     Defendant Post Consumer Brands is a corporation with its headquarters located at 221 Bolivar Street, Jefferson City, Missouri 65101.  Relevant to Plaintiff's claim herein, Defendant Post Consumer Brands is a leading manufacturer, packager, and distributor of pet food.    At all relevant times subsequent to approximately April 2023, including during the Class Period, Defendant has advertised, marketed, manufactured, distributed, and/or sold the 9Lives and Kibbles 'n Bits Products at issue, to consumers in and throughout California and the United States.  Defendant formulated, directed, controlled, had the authority to control, and/or participated in the acts and practices set forth in this Complaint.

**JURISDICTION AND VENUE**

23.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), as amended by the Class Action Fairness Act of 2005 ("CAFA"), because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are over 100 members of the putative class, and Plaintiff, as well as most members of the proposed class, are citizens of different states than Defendants.  This Court also has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

24.     This Court has personal jurisdiction over Defendants because Defendants purposefully availed themselves of this forum by conducting substantial business within California such that Defendants have significant, continuous, and pervasive contacts with the State of California.

25.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do substantial business in this District and a substantial part of the events giving rise to Plaintiff's claims took place within this District and Plaintiff was subject to Defendants' advertisements in this District.

## FACTUAL ALLEGATIONS

### A.     The Presence of TiO2 Renders Healthful Representations Misleading

26.     Titanium dioxide ("TiO2") is an inorganic compound that is easily powdered and pure white in color.  Because of this property, it is relied upon heavily as a pigment in a variety of applications including paint, sunscreen, and food coloring.  When used as a food colorant it is known as E171.

27.     The food industry used TiO2 ubiquitously for over 30 years, but in the last decade research began to call its fitness for consumption into serious question, and responsible food makers have reacted accordingly.

28.     As early as 2014, big players in the food and confections market began to alert the public of their intention to remove TiO2 from its confectionary products for consumption.  For example, in response to one company's announcement that it would remove TiO2 from its products, Jaydee Hanson, Senior Policy Analyst at Center for Food Safety, stated that "Studies have shown that the human health risks associated with ingesting nanoparticles of many common food additives [such as titanium dioxide] far outweigh any utility for producers.  There are plenty of non-toxic alternatives available and we urge [] others to commit to not using any engineered nanomaterials in human and animal food products."

29.     The reason for eliminating titanium dioxide is simple: research has shown that TiO2 can pass through biological membranes, circulate through the body, and enter cells.  These properties mean it can have detrimental health effects including DNA and chromosomal damage, organ damage, inflammation, brain damage, genital malformations, lesions in the liver and kidneys, and cell neurosis.  Titanium dioxide also builds up in the body's intestinal tract.  Ordinarily, the intestinal track is where nutrients are absorbed into the bloodstream.  However, titanium dioxide cannot be absorbed.  When this occurs, the body's M-Cells absorb these particles and bring them to the innate

immune system.  Over time, the titanium dioxide particles are incorporated by the innate immune system cells where they will remain without being degraded or dissolved.

30.     In 2019, the French government responded to these troubling findings by banning all foods containing titanium dioxide.  In October 2020, the European Parliament removed titanium dioxide from the list of food additives authorized by the European Union for human consumption. European researchers studying titanium dioxide noted that the long half-life of titanium dioxide nanoparticles created the potential for the particles to accumulate inside human organs and tissue. European researchers also determined that titanium dioxide nanoparticles could cause DNA strands to break, leading to chromosomal damage.

31.     These health concerns and government actions are not limited to human foods.  In November 2018, Petco—North America's second-largest pet supplies chain—announced its intention to pull all dog and cat food and treats that contain harmful artificial ingredients, including TiO2.  This decision, to remove harmful foods and treats from store shelves and ecommerce, was completed by May 2019.  Petco explained its decision reflects veterinarian recommendations and consumer preferences.  Petco cited a survey that shows a majority of veterinarians agree that pet owners should actively seek out foods with no artificial flavors, no artificial colors, and no artificial preservatives.  The same survey showed that a noteworthy 87% of pet owners believe it is important to their pets' health and well-being to serve food to their pets that is free of harmful ingredients.

32.     Titanium dioxide creates risks due to genotoxicity, the ability of a substance to damage DNA, the genetic material of cells.  When orally ingested, TiO2 particles can accumulate in the body.  One study suggests that even at a low dose of TiO2, the ingredient can induce adverse cardiovascular effects after 30 to 90 days of oral exposure, and thus warns consumers against TiO2 intake.[4]

---

[4] Zhangjian Chen et al., *Effect of Titanium Dioxide Nanoparticles on the Cardiovascular System After Oral Administration*, 239(2) TOXICOL LETTERS 123 (2015), https://pubmed.ncbi.nlm.nih.gov/26387441/.

33.     More recently, in 2021, the European Food Safety Authority ("EFSA") announced that TiO2 can no longer be considered safe for consumers or animals when used as an additive in animal feed.  The EFSA specifically raised concerns about genotoxicity.

34.     Accordingly, in November 2021, the European Commission banned the use of TiO2 as an additive in animal food.

**B.     The Presence (or Risk) of PFAS Renders Healthful Representations Misleading**

35.     Research by the Environmental Working Group ("EWG") showed that Defendants' Products contain (or risk containing) heightened levels of organic fluorine indicative of PFAS (measure in parts per million), as well as various named PFAS (measured in parts per billion), in the packaging.

36.     EWG commissioned an independent laboratory to conduct total fluorine tests, as well as tests for specific PFAS.  EWG tested various pet food products, including two of Defendants' Products.[5]  A total fluorine test presents a scientifically valid method of testing for PFAS used by both the food industry and researchers.

37.     All PFAS contain organic fluorine and there are few other sources of the compound. Accordingly, the packaging industry has adopted total fluorine tests to assess a material's total PFAS content.  For example, the Biodegradable Products Institute ("BPI") has adopted 100ppm as a threshold.  Amounts over 100 ppm are considered indicative of intentional use of PFAS.

38.     Scientists have also acknowledged that total fluorine tests represent a scientifically valid method of testing for PFAS.  Indeed, Rainier Lohmann, Director of University of Rhode Island's Lohmann Lab has explained that "[i]f a product is showing really high fluorine levels, companies really can't claim they didn't use PFAS."

---

[5] Defendants rely on many of the same suppliers for each of the Products' packaging and has not substantially or meaningfully altered its suppliers for the Products' packaging for several years.  In addition, Defendants have not substantially or meaningfully altered the components comprising the Products' packaging within the past several years.  Because the packaging for the Products is comprised of similar and unaltered components, and some have tested for PFAS, it is highly likely that the packaging of each of Defendants' Products are also comprised of certain named PFAS.

39.     The laboratory results showed that Meow Mix Tender Centers contained 630 ppm and named PFAS in the amount of 5 ppb and that Kibbles 'n Bits Bacon & Steak contained 590 ppm and named PFAS in the amount of 14.3 ppb.

40.     Unlike the products offered by Defendants' competitors, Defendants' Products contained the highest levels of total fluorine indicating PFAS.  With the exception of a single product, each of the other competitor products tested by the laboratory showed amounts of fluorine below the threshold for intentional use of fluorine, which is 100 ppm.

41.     Researchers have established with certainty that chemicals migrate from food contact articles onto food.  Scientists have studied this phenomenon for decades and describe it as "migration."  Because PFAS are incredibly mobile, they readily migrate into food.

42.     Scientists are incredibly concerned about the health risks raised by PFAS.  All PFAS share a concerning structural feature, specifically the presence of perfluoroalkyl moieties, which results in their shared resistance to metabolic degradation.  As PFAS persist and mix with other substances, there is an increased exposure for health effects, such as eye disease and increased risk of obesity.[6]

43.     Indeed, animal studies have found that PFAS can cause, among other serious health effects, damage to the liver and immune system, various cancers, such as kidney and testicular concerns, and increased cholesterol levels.

44.     Research shows that there is a reduced latency period for pets and such health risks may materialize in a matter of a few years given pets' shorter lifespan.

---

[6] Mohammed Zeeshan et al., *Incidence of Ocular Conditions Associated with Perfluoroalkyl Substances Exposure: Isomers of C8 Health Project in China*, 137 ENVIRONMENT INT'L (2020), https://www.sciencedirect.com/science/article/pii/S0160412019338152.

1

**C.      Defendants' Misrepresentations and Omissions are Actionable**

2

45.      Defendants have endangered consumers' pets, exposing them to TiO2 and PFAS,

3

which Defendants know carries significant health concerns.  Even though the Products contain the

4

harmful ingredient, Defendants represent that the Products are healthful for animals.

5

46.      On the 9Lives cat food packaging, for example, Defendants represent that it has been

6

"caring for cats since 1959."  Specifically, Defendants represent that the Products provide "100%

7

Complete & Balanced For Adult Maintenance" and "100% Complete and Balanced Nutrition for

8

Adult Cats."  Defendants completement these statements with "Helps Support a Healthy Immune

9

System," "Helps Support Healthy Weight & Metabolism," "Helps Maintain Weight & Digestion,"

10

"Blend of Essential Vitamins and Minerals," and "High Quality Ingredients & Natural Fiber."

11

Defendants further represent that the pet food will build "strong muscles," enable "healthy heart and

12

vision," and produce "healthy skin & coat."  Plaintiff saw these representations and appreciated that

13

these representations meant that the Products were healthful for her cat.  Plaintiff would not have

14

purchased these Products absent her desire to provide healthful nutrition for her cat and these

15

representations led her to believe she was doing so.

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28








47.     On the Kibbles 'n Bits dog food packaging, Defendants similarly represent that the food is healthful for pets by stating the Products are "100% Complete and Balanced Nutrition for Adult Dogs." Defendants further represent the Product's healthful properties by stating that there is "balanced nourishment in every bite!" Plaintiff saw these representations and appreciated that these representations meant that the Products were healthful for her dog. Plaintiff would not have purchased these Products absent her desire to provide healthful nutrition for her dog and these representations led her to believe she was doing so.

 

48.     On the Meow Mix cat food packaging, Defendant J.M. Smucker also represents the Products as healthful by stating the pet food is "100% Complete & Balanced Nutrition For Adult Cats" and intended for "indoor health." Defendant J.M. Smucker further represents that the Products have "all essential vitamins & minerals," "antioxidants [that] help support a long, healthy life," and

1
2
3
4

the food "helps maintain healthy weight."  Plaintiff saw these representations and appreciated that these representations meant that the Products were healthful for her cat.  Plaintiff would not have purchased these Products absent her desire to provide healthful nutrition for her cat and these representations led her to believe she was doing so.









49.     Each of these statements represent pure and partial omissions as well as misrepresentations regarding the Products' healthfulness to pets.

50.     Indeed, the Products contain TiO2.  Yet Defendants only rely on the ingredient list, which is provided in tightly woven, miniscule block print on the back of the Products, which consumers are unlikely to notice.

51.     Moreover, the Products contain (or risk containing) PFAS.  Yet Defendants do not disclose on its Products' packaging that the products contain (or risk containing) PFAS.

52.     As a result, Plaintiff and the Class were injured by the full purchase price of the Products because the Products are worthless, as they are marketed as healthful for animal consumption when they are not.

53.     Plaintiff and Class Members bargained for products that are healthful for consumption and were deprived of the basis of their bargain when Defendants sold them Products in packaging containing substances heightening the risks of serious negative health effects.  No reasonable consumer would expect that the Products marketed as "100% complete and balanced nutrition" for animal consumption, "Helps Support a Healthy Immune System," "Blend of Essential Vitamins and Minerals," and containing "antioxidants [that] help support a long, healthy life" would pose a risk to their pets' health, safety, and well-being.  Nor would a reasonable consumer expect the Products, represented as healthful, to contain TiO2 or contain (or risk containing) PFAS, both of which are linked to harmful health effects—such as DNA and chromosomal damage, organ damage, inflammation, brain damage, genital malformations, lesions in the liver and kidneys, cell neurosis, damage to the liver and immune system, various cancers, increased cholesterol levels, increased risk of obesity, adverse cardiovascular effects, and eye disease.  Accordingly, Plaintiff and Class Members suffered economic injuries as a result of purchasing the Products.

54.     Moreover, because these facts relate to a critical safety-related deficiency in the Products, Defendants were under a continuous duty to disclose to Plaintiff and Class Members the true standard, quality, and grade of the Products and to disclose that the Products contained, or risked containing, substances known to have adverse health effects.  Defendants also had a duty to disclose

because of its exclusive and/or superior knowledge concerning the true nature of the Products. Nonetheless, Defendants concealed and misrepresented this information, as discussed herein.

55.     Although Defendants are in the best position to know what content it placed on its packaging during the relevant timeframe, and the knowledge that Defendants had regarding the presence of TiO2 and presence (or risk of presence of) PFAS that rendered its representations misleading, to the extent necessary, Plaintiff satisfies the requirements of Rule 9(b) by alleging the following facts with particularity:

56.     **WHO**: Defendants made material misrepresentations and omissions of fact about the Products through its labeling which shows that the Products are healthful.  These representations constitute omitted material information regarding harmful chemicals.

57.     **WHAT**:  Defendants' conduct here was, and continues to be, fraudulent because it omitted and concealed that the Products contain TiO2 and contain (or risk containing) PFAS—which are widely known to have significant health repercussions.  Thus, Defendants' conduct deceived Plaintiff and Class Members into believing that the Products are healthful for animal consumption when they are not.  Defendants knew or should have known that this information is material to reasonable consumers, including Plaintiff and Class Members in making their purchasing decisions, yet it continued to pervasively market the Product in this manner in the U.S. market to convince consumers the Products are healthful for pets.

58.     **WHEN**:  Defendants made material misrepresentations and omissions during the putative class periods, including prior to and at the time Plaintiff and Class Members purchased the Products, despite its knowledge that the Products contained TiO2 and contained (or risk containing) PFAS, harmful substances with known adverse health effects.

59.     **WHERE**:  Defendants' marketing messages were uniform and pervasive, carried through material misrepresentations and omissions on the labeling of the Products' packaging, website, and through marketing materials.

60.     **HOW**:  Defendants made material misrepresentations and omissions of fact regarding the Products, including the presence of TiO2 and presence (or risk of presence) of PFAS in the Products.

61.   **WHY**:  Defendants made the material misrepresentations and omissions detailed herein for the express purpose of inducing Plaintiff, Class Members, and all reasonable consumers to purchase and/or pay for the Products, the effect of which was that Defendants profited by selling the Products to hundreds of thousands of consumers.

62.   **INJURY**:  Plaintiff and Class Members purchased, paid a premium (up to the full-price), or otherwise paid more for the Products when they otherwise would not have absent Defendants' misrepresentations and omissions.

## CLASS ALLEGATIONS

63.   ***Class Definition.***    Plaintiff brings this action on behalf of a class of similarly situated individuals, defined as all persons in the State of California who, within the applicable statute of limitations period, up to and including the date of final judgement in this action, purchased any of Defendants' Products at issue (the "Class").

64.   Excluded from the Class are persons who made such purchase for purpose of resale, Defendants and any entities in which Defendants have a controlling interest, Defendants' agents and employees, the judge to whom this action is assigned, and members of the judge's staff, and the judge's immediate family.

65.   Plaintiff reserves the right to amend the definition of the Class if discovery or further investigation reveals that the Class should be expanded or otherwise modified.

66.   ***Numerosity.***    Members of the Class so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Class number in the millions.  The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined though discovery.  Class members may be notified of the pendency of this action by mail and/or publications through the distribution records of Defendants and third-party retailers and vendors.

67.   ***Commonality and Predominance.***  Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Common legal and factual questions include but are not limited to: (1) whether Defendants warranted the Products as "Safe for Animal Consumption"; (2) whether the Products contain Titanium Dioxide;

(3) whether the Products contain PFAS; (4) whether Defendants breached these warranties; and (5) whether Defendants committed the statutory and common law violations alleged against them herein by doing so.

68.     ***Typicality.***     Plaintiff's claims are typical of the claims of the Class in that Plaintiff purchased Defendants' Products in reliance on the presentations and warranties described above and suffered a loss as a result of that purchase.

69.     ***Adequacy.***     Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the Class members she seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously.  The interests of the Class members will be fairly and adequately protected by Plaintiff and her counsel.

70.     ***Superiority.***     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members.  Individually, Class members may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability.  Individualized litigation increases the delay and expense of all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of the case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability.  Class treatment of the liability issue will ensure that all claims and claimants are before this Court for consistent adjudication of liability issues.

71.     Defendants have acted or failed to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

72.     Without a class action, Defendants will continue a course of action that will result in further damages to Plaintiff and members of the Class and will likely retain the benefits of its wrongdoing.

73.     Based on the foregoing allegations, Plaintiff's claims for relief include those set forth below.

**COUNT I**
**(Violation of California's Unfair Competition Law,**
**Cal. Bus. & Prof. Code §§ 17200, *et seq.*)**

74.     Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

75.     Plaintiff brings this claim individually and on behalf of the Class against Defendants.

76.     California Business and Professions Code § 17200 prohibits "any unlawful, unfair, or fraudulent business act or practice."  For the reasons discussed above, Defendants have engaged in unlawful, unfair, and fraudulent business acts or practices in violation of California Business & Professions Code § 17200.

77.     By committing the acts and practices alleged herein, Defendants have violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200-17210 by engaging in unlawful, fraudulent, and unfair conduct.

78.     Defendants have violated the UCL's proscription against engaging in **Unlawful Business Practices** as a result of its violations of the CLRA, Cal. Civ. Code § 1770(a)(5), (a)(7), and (a)(9) as alleged below, violations of California's False Advertising Law, in addition to violations of common law.

79.     As more fully described above, Defendants' misleading marketing, advertising, packaging, and labeling of the Products are likely to deceive reasonable consumers.  In addition, Defendants have committed unlawful business practices by, inter alia, making the representations and omissions of material facts, as set forth more fully herein, and violating the common law.

80.     Plaintiff and the Class members reserve the right to allege other violations of law which constitute other unlawful business acts or practices.

81.     Defendants have also violated the UCL's proscription against engaging in **Unfair Business Practices**.  Defendants' acts, omissions, misrepresentations, practices and non-disclosures as alleged herein also constitute "unfair" business acts and practices within the meaning of Business & Professions Code § 17200 *et seq.* in that its conduct is substantially injurious to consumers, offends

public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

82.     There were reasonably available alternatives to further Defendants' legitimate business interests, other than the conduct described herein as noted above.

83.     Defendants have further violated the UCL's proscription against engaging in **Fraudulent Business Practices**.  Defendants' claims, nondisclosures, and misleading statements with respect to the Products, as more fully set forth above, were false, misleading, and/or likely to deceive the consuming public within the meaning of Business & Professions Code § 17200.

84.     Plaintiff and the other Class members suffered a substantial injury by virtue of buying the Products that they would not have purchased absent Defendants' unlawful, fraudulent, and unfair marketing, advertising, packaging, and omission about the defective nature of the Products.

85.     There is no benefit to consumers or competition from deceptively marketing and omitting material facts about the true nature of the Products.

86.     Plaintiff and the other Class members had no way of reasonably knowing that the Products they purchased were not as marketed, advertised, packaged, or labeled.  Thus, they could not have reasonably avoided the injury each of them suffered.

87.     The gravity of the consequences of Defendants' conduct as described outweighs any justification, motive, or reason therefore, particularly considering the available legal alternatives which exist in the marketplace, and such conduct is immoral, unethical, unscrupulous, offends established public policy, or is substantially injurious to Plaintiff and the other Class members.

88.     Pursuant to California Business and Professional Code § 17203, Plaintiff and the Class seek an order of this Court that includes, but is not limited to, an order requiring Defendants to (a) provide restitution to Plaintiff and the other Class members; (b) disgorge all revenues obtained as a result of violations of the UCL; and (c) pay Plaintiff's attorneys' fees and costs.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<u>COUNT II</u>
**(Violation of California's Consumers Legal Remedies Act ("CLRA"),
California Civil Code § 1750, *et seq.*)**

89.     Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

90.     Plaintiff brings this claim individually and on behalf of the Class against Defendants.

91.     Civil Code § 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have."

92.     Civil § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."

93.     Civil § 1770(a)(9) prohibits "advertising goods or services with intent not to sell them as advertised."

94.     Defendants violated Civil Code § 1770(a)(5), (a)(7), and (a)(9) by holding out the Products as healthful when in fact the Products are not healthful.

95.     The Products are not healthful because they contain TiO2 and contain (or risk containing) PFAS.

96.     Defendants failed to adequately disclose that the Products contain TiO2.

97.     Defendants failed to disclose that the Products contain (or risk containing) PFAS.

98.     Defendants have exclusive and/or superior knowledge of the health risks of the Product, which was not known to Plaintiff or Class Members.

99.     Defendants made partial representations to Plaintiff and Class members, while suppressing the true nature of the Products.  Specifically, by displaying the Products and describing the Products as healthful, including on the product packaging, on its website, and in its marketing, without disclosing that the Products were harmful to animal health.   Moreover, Defendants affirmatively misrepresented the Products despite their knowledge that the Products were not as advertised.

100.     Plaintiff and the Class members have suffered harm as a result of these violations of the CLRA because they have incurred charges and/or paid monies for the Products that they otherwise would not have incurred or paid, and were unknowingly exposed to a significant and substantial health risk.

101.     On August 26, 2022, prior to the filing of this Complaint, Plaintiff's counsel sent Defendant J.M. Smucker a CLRA notice letter, which complies in all respects with California Civil Code § 1782(a).  The letter was sent via certified mail, return receipt requested, advising Defendant J.M. Smucker that it was in violation of the CLRA with respect to the presence of TiO2 in the Products, and demanding that it cease and desist from such violations and make full restitution by refunding the monies received therefrom.  The letter stated that it was sent on behalf of all other similarly situated purchasers.

102.     On February 14, 2023, Plaintiff's counsel sent Defendant J.M. Smucker a CLRA notice letter, which complies in all respects with California Civil Code § 1782(a).  The letter was sent via certified mail, return receipt requested, advising Defendant J.M. Smucker that it was in violation of the CLRA with respect to the presence of PFAS and TiO2 in the Products, and demanding that it cease and desist from such violations and make full restitution by refunding the monies received therefrom.  The letter stated that it was sent on behalf of all other similarly situated purchasers.

103.     On July 24, 2023, Plaintiff's counsel sent Defendant Post Consumer Brands a CLRA notice letter, which complies in all respects with California Civil Code § 1782(a).  The letter was sent via certified mail, return receipt requested, advising Defendant Post Consumer Brands that it was in violation of the CLRA with respect to the presence of PFAS and TiO2 in the Products, and demanding that it cease and desist from such violations and make full restitution by refunding the monies received therefrom.  The letter stated that it was sent on behalf of all other similarly situated purchasers.

104.     Defendants J.M. Smucker and Post Consumer Brands failed to remedy the issues raised in the notice letters.  Accordingly, Plaintiff seeks damages from Defendants for their violations of the CLRA.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

105.    Injunctive relief is appropriate, and indeed necessary, to require Defendants to provide full and accurate disclosures regarding the Products so that Plaintiff and Class members can reasonably rely on Defendants' representations as well of those of Defendants' competitors who may then have an incentive to follow Defendants' deceptive practices, further misleading consumers.

### COUNT III
**(Violation of California's False Advertising Law,
Cal. Bus. & Prof. Code § 17500, *et seq*.)**

106.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

107.    Plaintiff brings this claim individually and on behalf of the Class against Defendants.

108.    Defendants' acts and practices, as described herein, have deceived and/or are likely to continue to deceive Class members and the public.  As described above, and throughout this Complaint, Defendants misrepresented the Products as healthful when, in fact, the Products were not healthful and instead heighten health risks.

109.    By their actions, Defendants disseminated uniform advertising regarding the Products to and across California.  The advertising was, by its very nature, unfair, deceptive, untrue, and misleading within the meaning of Cal. Bus. & Prof. Code § 17500, *et seq*.  Such advertisements were intended to and likely did deceive the consuming public for the reasons detailed herein.

110.    The above-described false, misleading, and deceptive advertising Defendants disseminated continues to have a likelihood to deceive in that Defendants failed to disclose that the Products contain (or risk containing) substances that pose a significant risk to the health and wellbeing of animals, as well as to the environment.

111.    Defendants continue to misrepresent to consumers that the Products were healthful when in fact the Products are not.

112.    In making and disseminating these statements, Defendants knew, or should have known, their advertisements were untrue and misleading in violation of California law.  Plaintiff and other Class members based their purchasing decisions on Defendants' omitted material facts.  The revenue attributable to the Products sold in those false and misleading advertisements likely amounts

to tens of millions of dollars.  Plaintiff and Class members were injured in fact and lost money and property as a result.

113.    The misrepresentations and non-disclosures by Defendants of the material facts described and detailed herein constitute false and misleading advertising and, therefore, constitute a violation of Cal. Bus. & Prof. Code § 17500, *et seq*.

114.    As a result of Defendants' wrongful conduct, Plaintiff and Class members lost money in an amount to be proven at trial.  Plaintiff and Class members are therefore entitled to restitution as appropriate for this cause of action.

115.    Plaintiff and Class members seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Defendants' unfair, unlawful, and fraudulent business practices; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief.

## COUNT IV
### (Fraud)

116.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

117.    Plaintiff brings this claim individually and on behalf of the Class under California law.

118.    At the time Plaintiff and Class Members purchased the Products, Defendants did not disclose, but instead concealed and misrepresented, the Products as healthful.

119.    Defendants affirmatively misrepresented the Products, giving the Products the appearance of a product that is indeed healthful.

120.    Defendants also knew that its omissions and misrepresentations regarding the Products were material, and that a reasonable consumer would rely upon Defendants' representations (and corresponding omissions) in making purchasing decisions.

121.    Plaintiff and Class Members did not know—nor could they have known through reasonable diligence—about the true nature of the Products.

122.    Plaintiff and Class Members would have been reasonable in relying on Defendants' misrepresentations (and corresponding omissions) in making their purchasing decisions.

123.    Plaintiff and Class Members had a right to reply upon Defendants' representations (and corresponding omissions) as Defendants maintained monopolistic control over knowledge of the true quality of the Products.

124.    Plaintiff and Class Members sustained damages as a result of their reliance on Defendants' omissions and misrepresentations, thus causing Plaintiff and Class Members to sustain actual losses and damages in a sum to be determined at trial, including punitive damages.

## COUNT V
**(Fraudulent Inducement)**

125.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

126.    Plaintiff brings this claim individually and on behalf of the Class under California law.

127.    Defendants did not disclose, but instead concealed and misrepresented, the Products as discussed herein.

128.    Defendants knew, or should have known, that the Products were falsely portrayed and that knowledge of the safety-related issues discussed throughout was withheld from the consumer public.

129.    Defendants also knew that omissions and misrepresentations regarding the Product were material, and that a reasonable consumer would rely on Defendants' representations (and corresponding omissions) in making purchasing decision.

130.    Plaintiff and Class members did not know—nor could they have known through reasonable diligence—about the true quality of the Products.

131.    Plaintiff and Class members were reasonable in relying on Defendants' misrepresentations (and corresponding omissions) in making their purchasing decisions.

132.    Plaintiff and Class members had a right to rely on Defendants' representations (and corresponding omissions) as Defendants maintained a monopolistic control over the Products, and what information was available regarding the Products.

133.    Defendants intended to induce—and did, indeed, induce—Plaintiff and Class members into purchasing the Products based upon their affirmative representations and omissions.

134.    Plaintiff and Class members sustained damages as a result of their reliance on Defendants' omission and misrepresentations, thus causing Plaintiff and Class members to sustain actual losses and damages in a sum to be determined at trial.

**<u>COUNT VI</u>**
**(Fraudulent Concealment or Omission)**

135.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

136.    Plaintiff brings this claim individually and on behalf of the Class under California law.

137.    At all relevant times, Defendants were engaged in the business of designing, manufacturing, distributing, and selling the Products.

138.    Defendants, acting through their representatives or agents, delivered the Products to their own distributors and various other distribution channels.

139.    Defendants willfully, falsely, and knowingly omitted material facts and made partial representations regarding the quality and character of the Products as discussed throughout.

140.    Rather than inform consumers of the truth regarding the Products, Defendants misrepresented the quality of the Products as discussed herein at the time of purchase.

141.    Defendants made these material omissions and partial representations to boost or maintain sales of the Products, and to falsely assure purchasers of the Products that Defendants are a reputable company and that their Products are healthful.  The omitted information and partial representations were material to consumers because the representations played a significant role in the value of the Products purchased.

142.    Plaintiff and Class members accepted the terms of use, which were silent on the true nature of the Products, as discussed throughout.  Plaintiff and Class members had no way of knowing that Defendants' misrepresentations as to the Products and had no way of knowing that Defendants' misrepresentations were misleading.

143.    Although Defendants had a duty to ensure the accuracy of the information regarding the Products because they were in exclusive knowledge of this information, the information pertains to matters of health, and Defendants made partial representations.  But they did not fulfill that duty.

144.    Defendants misrepresented material facts partly to pad and protect their profits, as they saw that profits and sales of the Products were essential for its continued growth and to maintain and grow their reputation as a premier manufacturer and seller of the Products.  Such benefits came at the expense of Plaintiff and Class members.

145.    Plaintiff and Class members were unaware of these material misrepresentations, and they would not have acted as they did had they known the truth.  Plaintiff's and Class members' actions were justified given Defendants' misrepresentations.  Defendants were in the exclusive control of material facts, and such facts were not known to the public.

146.    Due to Defendants' misrepresentations, Plaintiff and Class members sustained injury due to the purchase of the Products that did not live up to their advertised representations.  Plaintiff and Class members are entitled to recover full refunds for the Products they purchased due to Defendants' misrepresentations.

147.    Defendants' acts were done maliciously, oppressively, deliberately, and with intent to defraud, and in reckless disregard of Plaintiff, and Class members' rights and well-being, and in part to enrich themselves at the expense of consumers.  Defendants' acts were done to gain commercial advantage over competitors, and to drive consumers away from consideration of competing products. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

## COUNT VII
**(Fraudulent Misrepresentation)**

148.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

149.    Plaintiff brings this claim individually and on behalf of the Class under California law.

150.    Defendants falsely represented to Plaintiff and the Class that the Products were healthful.

151.    Defendants intentionally, knowingly, and recklessly made these misrepresentations to induce Plaintiff and the Class to purchase the Products.

152.    Defendants knew or should have known that their representations about the Products were false in that the Products are not healthful as discussed throughout.  Defendants knowingly allowed their packaging, labels, advertisements, promotional materials, and websites to intentionally mislead consumers, such as Plaintiff and the Class.

153.    Plaintiff and the Class did in fact rely on these misrepresentations and purchased the Products to their detriment.  Given the deceptive manner in which Defendants advertised, marketed, represented, and otherwise promoted the Products, Plaintiff's and the Class's reliance on Defendants' misrepresentations was justifiable.

154.    As a direct and proximate result of Defendants' conduct, Plaintiff and the Class have suffered actual damages in that they would not have purchased the Products at all had they known of the safety risks associated with the Products and that they do not conform to Defendants' advertising and marketing.

155.    Plaintiff and the Class seek actual damages, attorney's fees, costs, and other such relief the Court deems proper.

## COUNT VIII
### (Negligent Misrepresentation)

156.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

157.    Plaintiff brings this claim individually and on behalf of the Class under California law.

158.    Defendants had a duty to Plaintiff and the Class to exercise reasonable and ordinary care in the developing, testing, manufacture, marketing, detailing, distribution, and sale of the Products.

159.    Defendants breached their duty to Plaintiff and the Class by developing, testing, manufacturing, marketing, detailing, distributing, and selling the Products to Plaintiff and the Class that did not have the qualities, characteristics, and suitability for use as advertised by Defendants and by failing to promptly remove the Products from the marketplace or take other appropriate remedial action.

160.     Defendants knew or should have known that the qualities and characteristics of the Products were not as advertised, marketed, detailed, or otherwise represented or suitable for its intended use and were otherwise not as warranted and represented by Defendants.  Specifically, Defendants knew or should have known that the Product was not healthful and raised health risks.

161.     As a direct and proximate result of Defendants' conduct, Plaintiff and the Class have suffered actual damages in that they would not have purchased the Products at all had they known that the Products were not healthful and that the Products do not conform to the Product's labeling, packaging, advertising, and statements.

162.     Plaintiff and the Class seek actual damages, attorney's fees, costs, and any other just and proper relief available.

### COUNT IX
### (Quasi-Contract / Unjust Enrichment)

163.     Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

164.     Plaintiff brings this claim individually and on behalf of the Class under California law.

165.     To the extent required by law, this cause of action is alleged in the alternative to legal claims, as permitted under Fed. R. Civ. P. 8.

166.     Plaintiff and Class members conferred benefits on Defendants by purchasing the Products.

167.     Defendants were unjustly enriched in retaining the revenues derived from Plaintiff and Class members' purchases of the Products.  Retention of those monies under these circumstances is unjust and inequitable because Defendants failed to disclose that the Products were not healthful as advertised, rendering them unfit for their intended purpose.  These omissions caused injuries to Plaintiff and Class members because they would not have purchased the Product if the true facts were known.

168.     Because Defendants' retention of the non-gratuitous benefits conferred on them by Plaintiff and Class members is unjust and inequitable, Defendants have been unjustly enriched in an amount to be determined at trial.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendants, as follows:

(a)   For an order certifying the Class under Fed. R. Civ. P. 23 and naming Plaintiff as representatives of the Class and Plaintiff's attorneys as Class Counsel;

(b)   For an order declaring the Defendants' conduct violates the statutes referenced herein;

(c)   For an order finding in favor of Plaintiff, the Class on all counts asserted herein;

(d)   For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

(e)   For prejudgment interest on all amounts awarded;

(f)   For an order of restitution and all other forms of equitable monetary relief;

(g)   For injunctive relief as pleaded or as the Court may deem proper;

(h)   For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated:  August 31, 2023          **BURSOR & FISHER, P.A.**

By:   _/s/ L. Timothy Fisher_
          L. Timothy Fisher

L. Timothy Fisher (State Bar No. 191626)
Emily A. Horne (State Bar No. 347723)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
          ehorne@bursor.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**BURSOR & FISHER, P.A.**
Jonathan L. Wolloch (admitted *pro hac vice*)
701 Brickell Avenue, Suite 1420
Miami, FL 33131
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
E-mail: jwolloch@bursor.com

*Attorneys for Plaintiff*

**CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)**

I, L. Timothy Fisher, declare as follows:

1.       I am an attorney at law licensed to practice in the State of California and a member of the bar of this Court.  I am a partner at Bursor & Fisher, P.A., counsel of record for Plaintiff. Plaintiff Humphrey resides in Clearlake, California.  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify thereto under oath.

2.       The Complaint filed in this action is filed in the proper place for trial under Civil Code Section 1780(d) in that a substantial portion of the events alleged in the Complaint occurred in the Northern District of California, as Plaintiff purchased the Products within this District.  Additionally, Defendants advertised, marketed, manufactured, distributed, and/or sold the Products at issue to Class Members from this District.

I declare under the penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct and that this declaration was executed at Walnut Creek, California this 31st day of August, 2023.


      _/s/ L. Timothy Fisher_____
            L. Timothy Fisher