UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SANDRA JERUCHIM, et al.,

        Plaintiffs,

    v.

THE J.M. SMUCKER COMPANY, et al.,

        Defendants.

Case No.  22-cv-06913-WHO

**ORDER GRANTING CLASS CERTIFICATION AND ADDRESSING SEALING MOTIONS**

Re: Dkt. Nos. 85, 86, 90, 94, 95, 96 97, 98

99, 100

Plaintiffs Sandra Jeruchim ("Jeruchim") and Melissa Vargas ("Vargas") bring this putative class action against defendant The J.M. Smucker Company ("Smucker") for allegedly misleading statements and omissions relating to three brands of pet food products that Smucker produces and sells.  Plaintiffs now move to certify a class of consumers who purchased the products from November 4, 2018 through December 31, 2022, pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3).  Having considered the parties' briefing, the relevant law, and the record in this case, plaintiffs' motion for class certification is GRANTED.

**BACKGROUND**

The parties are familiar with the background of this case.  To best explain my reasoning and to summarize key developments since the parties' previous motion to dismiss, I describe the facts as set forth in plaintiffs' Third Amended Complaint ("TAC").  *See* Dkt. No. 63.

Three brands of Smucker's pet food are pertinent to this case: 9Lives, Kibbles 'n Bits, and Meow Mix (collectively, the "disputed products").  TAC ¶ 1.  Plaintiffs Jeruchim and Vargas bring this action against Smucker for their alleged practice of "misleadingly label[ing]" the disputed products as "healthful despite containing titanium dioxide."  *Id.*  They also claim that the

United States District Court
Northern District of California

packaging of the disputed products "contain (or risk containing) per-and polyfluoroalkyl substances ("PFAS"), which are synthetical chemicals that pose undue health risks further rendering Defendants' healthful representations false and misleading." *Id.*

According to plaintiffs, Smucker has "known of the health problems posed by TiO2 since at least February 2014 when big players in the food market publicly announced they would no longer use the additive in products due to health concerns." *Id.* ¶ 2. This included fellow competitors in the pet food market. *Id.* ¶ 3. Similarly, Smucker has "long known of the health problems posed by PFAS, which persist and accumulate and are harmful even at very low levels." *Id.* ¶ 8. Despite their alleged knowledge of the presence of TiO2 and PFAS in their products, Smucker continued to sell the products to consumers, "abusing the public's trust and failing to inform [them] of the implications of consuming the toxins." *Id.* ¶ 13. Instead, Smucker only refers to TiO2 in "tightly wove, miniscule block print on the [ingredient list] on the back" of the disputed products and does not mention PFAS risks on the products whatsoever. *Id.*

In fact, despite knowledge of these ingredients, plaintiffs maintain that Smucker "represent[s] that the [disputed products] are healthful for animals." *Id.* ¶ 49. On the 9Lives cat food packaging, for example, Smucker represents that the product is "100% Complete & Balanced For Adult Maintenance" and "100% Complete and Balanced Nutrition for Adult Cats." *Id.* ¶ 50. Plaintiff Vargas "saw these representations and appreciated that these representations meant that the Products were healthful for her cat." *Id.* Had she known that the products contained TiO2 and PFAS, Vargas "would not have purchased" the product. *Id.*



2

United States District Court
Northern District of California

Similarly, the Kibbles 'n Bits dog food packaging represents that the product provides "100% Complete and Balanced Nutrition for Adult Dogs," and that there is "balanced nourishment in every bite!" *Id.* ¶ 51. Plaintiff Vargas similarly relied on these representations on the face of the packaging and repeatedly purchased Kibbles 'n Bits for her dog; had she known about the presence of TiO2 and PFAS, she would not have purchased the product. *Id.*



Finally, on the Meow Mix cat food packaging, Smucker represents that the product provides "100% Complete & Balanced Nutrition For Adult Cats" and contains "all essential vitamins & minerals," "antioxidants [that] help support a long, healthy life," and that the food "helps maintain healthy weight." *Id.* ¶ 52. Jeruchim and Vargas both "saw these representations and appreciated that [they] meant that the Products were healthful for their cats." *Id.* They "would not have purchased these Products absent their desire to provide healthful nutrition for their cats[,] and these representations led them to believe they were doing so." *Id.*



Plaintiffs maintain that "[e]ach of these statements represent pure and partial omissions as well as misrepresentations regarding the Products' healthfulness to pets." *Id.* ¶ 53. As a result, "Plaintiffs and the [proposed] Class were injured by the full purchase price of the Products because the Products are worthless, as they are marketed as healthful for animal consumption when they are not." *Id.* ¶ 56. They assert that "[n]o reasonable consumer would expect that the Products marketed as '100% complete and balanced nutrition' for animal consumption . . . would pose a risk to their pets' health, safety, and well-being." *Id.* ¶ 57. "Nor would a reasonable consumer expect the Products, represented as healthful, to contain TiO2 or contain (or risk containing) PFAS, both of which are linked to harmful health effects–such as DNA and chromosomal damage, organ damage, inflammation, brain damage, genital malformations, lesions in the liver and kidneys, cell neurosis, damage to the liver and immune system, various cancers," and more. *Id.* Because of this, "Plaintiffs and Class Members suffered economic injuries as a result of purchasing the Products." *Id.*

Plaintiffs also assert that "because these facts relate to a critical safety-related deficiency in the Products, Defendants were under a continuous duty to disclose to Plaintiffs and Class Members the true standard, quality, and grade of the Products and to disclose that the Products contained, or risked containing, substances known to have adverse health effects." *Id.* ¶ 58. Plaintiffs similarly conclude that Smucker "had a duty to disclose because of its exclusive and/or superior knowledge concerning the true nature of the Products." *Id.*

## PROCEDURAL HISTORY

Plaintiffs filed the TAC on April 2, 2024, alleging violations of California's consumer protection laws—namely, California's Unfair Competition Law ("UCL"), California's Consumers Legal Remedies Act ("CLRA"), and California's False Advertising Law ("FAL")—as well as various common law fraud claims and an unjust enrichment claim.

On July 10, 2025, plaintiffs filed their motion for class certification pursuant to Federal Rule of Civil Procedure 23. *See* Plaintiffs' Notice of Motion and Motion for Class Certification ("Mot.") [Dkt. No. 86]. Smucker filed its opposition on September 17, 2025, *see* Defendants' Response in Opposition to Plaintiffs' Motion ("Oppo.") [Dkt. No. 97], and plaintiffs filed its reply

United States District Court
Northern District of California

on October 29, 2025.  *See* Plaintiffs' Reply Memorandum in Support of their Motion ("Repl.") [Dkt. No. 99].  I heard oral argument on December 9, 2025.

**LEGAL STANDARD**

Federal Rule of Civil Procedure 23 governs class actions.  *See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 663–64 (9th Cir. 2022) (en banc).  "[C]ertification is proper only if 'the trial court is satisfied, after a rigorous analysis,'" that the requirements of Rule 23 are met.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011) (quoting *Gen. Tel. Co. of SW v. Falcon*, 457 U.S. 147, 161 (1982)).  "[P]laintiffs must prove the facts necessary to carry the burden of establishing that the prerequisites of Rule 23 are satisfied by a preponderance of the evidence."  *Olean*, 31 F.4th at 665.

A "plaintiff[] must make two showings" to certify its purported class.  *Olean*, 31 F.4th at 663.  "First, the plaintiffs must establish 'there are questions of law or fact in common to the class,' as well as demonstrate numerosity, typicality, and adequacy of representation."  *Id.* (quoting Fed. R. Civ. Proc. 23(a)).[1]  "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury,'" and the "claims must depend upon a common contention."  *Wal-Mart*, 564 U.S. at 349–50 (quoting *Falcon*, 457 U.S. at 157).

"Second, the plaintiffs must show that the class fits into one of three categories" as provided in Rule 23(b).  *Olean*, 31 F.4th at 663.  Under Rule 23(b)(3), a class may be certified if "questions of law or fact common to class members predominate over the questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. Proc. 23(b)(3). In deciding this, courts consider:

---

[1] Rule 23(a) provides:
> One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;
(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
(D) the likely difficulties in managing a class action.

*Id.*

Under Rule 23(b)(2), a class can be certified where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. Proc. 23(b)(2). To establish standing for prospective injunctive relief, a plaintiff must demonstrate that she "has suffered or is threatened with a concrete and particularized legal harm . . . coupled with a sufficient likelihood that [s]he will again be wronged in a similar way." *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (internal quotation marks and citations omitted). A plaintiff must establish a "real and immediate threat of repeated injury." *Id*. (internal quotation marks and citations omitted). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974).

"[P]laintiffs must prove the facts necessary to carry the burden of establishing that the prerequisites of Rule 23 are satisfied by a preponderance of the evidence. In carrying the burden of proving facts necessary for certifying a class under Rule 23(b)(3), plaintiffs may use any admissible evidence." *Olean*, 31 F.4th at 665 (citing *Tyson Foods v. Bouaphakeo*, 577 U.S. 442, 454-55 (2016)). While the class-certification analysis "may entail some overlap with the merits of the plaintiff's underlying claim, Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 465–66 (2013) (internal citations and quotation marks omitted). "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* (citation omitted).

In considering a motion for class certification, the substantive allegations of the complaint are accepted as true, but "the court need not accept conclusory or generic allegations regarding the

United States District Court
Northern District of California

suitability of the litigation for resolution through class action." *Hanni v. Am. Airlines*, No. C-08-00732-CW, 2010 WL 289297, at \*8 (N.D. Cal. Jan. 15, 2010).  The court may also "consider supplemental evidentiary submissions of the parties." *Id.*  "[T]he 'manner and degree of evidence required' at the preliminary class certification stage is not the same as 'at the successive stages of the litigation'—*i.e.*, at trial." *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1006 (9th Cir. 2018) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

# DISCUSSION

Plaintiffs seek to certify the following class:

> All persons in California who purchased any of the 9Lives-branded, Kibbles 'n Bits-branded, or Meow Mix-branded pet food products at issue (collectively, the "Products") from November 4, 2018, to and through December 31, 2022.

Mot. at 4.  Smucker argues that this case cannot or should not be certified.  I first address its arguments about standing and then turn to the class certification considerations under the Federal Rules, including Smucker's arguments about adequacy, typicality, and predominance.

## I.    STANDING

Smucker argues that plaintiffs lack both Article III and statutory standing to bring their claims.  *See* Oppo. at 7–13.  I disagree.

### A.    Article III Standing

To reach the merits of the proposed class certification, the named plaintiffs must establish that they have Article III standing.  *See NEI Contracting & Eng'g, Inc. v. Hanson Aggregates Pac. Sw., Inc.*, 926 F.3d 528, 532 (9th Cir. 2019).  A plaintiff has Article III standing if (1) she has suffered an injury-in-fact or faces an imminent injury; (2) the injury is fairly traceable to the defendant's conduct; and (3) a favorable decision would likely redress the injury.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  Plaintiffs must make a separate showing for each form of relief requested.  *Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983).

#### 1.    Injury-in-Fact

An injury-in-fact must be concrete, particularized, and imminent.  *Spokeo, Inc. v. Robins*, 517 U.S. 330, 339 (2016). An injury is concrete when it has a "close relationship" to a harm

7

"traditionally" recognized as providing basis for a suit. *TransUnion LLC v. Ramirez*, 514 U.S. 413, 417 (2021). An injury is particularized if it affects the plaintiff in a "personal and individual way." *Spokeo*, 578 U.S. at 339 (internal citation omitted). And an injury is actual or imminent if it has already occurred or there is a substantial risk it will occur. *See Lyons*, 461 U.S. at 105–06.

Smucker argues that the named plaintiffs lack any injury-in-fact because they "did not rely on any statements on Smucker's packaging," and thus cannot establish an "actual or imminent" injury. Oppo. at 8. Smucker alleges that upon Robin Humphrey's[2] death, plaintiffs added Jeruchim and Vargas as named plaintiffs to the case but did not change any of the substantive allegations. *Id.* at 3. Jeruchim and Vargas later testified in depositions that both did not "review[] the labeling, packaging, and material materials" for the disputed products, despite Humphreys alleging deceptive labeling practices. *Id.* (citing Third Am. Compl. ("TAC") [Dkt. No. 63] ¶¶ 18–19, 22–23).

Smucker primarily relies on *Anderson v. Apple, Inc.*, 500 F. Supp. 3d 993 (N.D. Cal. 2020) (Orrick, J.), to conclude that the named plaintiffs lack Article III standing. In *Anderson*, I recognized that in "claims involving misrepresentations to consumers, courts have often required that the consumers plausibly allege that they 'actually relied' on an allegedly misleading statement to plead Article III standing." *Id.* at 1005. The reasoning behind this requirement is that a "consumer's injury cannot be 'fairly traceable' to the defendant's alleged misrepresentation unless that consumer actually relied on that misrepresentation." *Id.* "If a defendant makes a misrepresentation and the plaintiff, without knowing of that misrepresentation, coincidentally purchases the product in question, her injury is not traceable to the misrepresentation." *Id.*

Plaintiffs believe that *Anderson* does not fully clarify the law regarding class certification and Article III standing. Rather, they argue that *DZ Reservation v. Meta Platforms, Inc.*, 96 F.4th 1223 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 1051 (2025), controls. There, the court considered whether the district court below erred in certifying a class of plaintiffs who alleged that Meta misrepresented the potential reach of advertisements on its platforms. *Id.* at 1231. Plaintiffs assert

United States District Court
Northern District of California

---

[2] Robin Humphrey was the original class representative of this case when it was filed in 2022.

United States District Court
Northern District of California

that the court in *DZ Reservation* "emphasize[d] that the defense of non-reliance is not a basis for denial of class certification" and is "more appropriately considered at the merits stage." Repl. at 2–3; *DZ Reservation*, 96 F.4th at 1238–39. But the issue Smucker raises goes to standing; the paragraphs plaintiffs cite in *DZ Reservation* address the merits of the class certification motion. These are two distinct issues that I must resolve, with standing preceding the class certification issue. *See NEI Contracting & Eng'g, Inc.*, 926 F.3d at 532. Plaintiffs' reading of *DZ Reservation* is unhelpful in parsing such distinctions.

On the question of standing, the *DZ Reservation* court found that "[c]onsumer fraud plaintiffs can satisfy the imminent injury requirement by showing they 'will be unable to rely on the product's advertising or labeling in the future, and so will not purchase the product although [they] would like to.'" *Id.* at 1240 (quoting *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 970 (9th Cir. 2018)). This is met here. Plaintiffs provided declarations from both Jeruchim and Vargas showing that they stopped purchasing Smucker products after learning that they contained PFAS. *See* Supplemental Declaration of Sandra Jeruchim ("Jeruchim Supp. Decl.") [Dkt. No. FILL] ¶ 6 ("Before I found out that Meow Mix was packaged in PFAS, I had already purchased Meow Mix for about 10 years. I first bought Meow Mix in 2016, . . . [and] I purchased the product from then until I found out in April 2024 that the pet food was packaged in PFAS. . . . [I]t is important for me to have known that Meow Mix was packaged in PFAS because I would not have bought the product if I had known [that Meow Mix was packaged in PFAS]."); Supplemental Declaration of Melissa Vargas ("Vargas Supp. Decl.") ¶ 6 ("Before making my first purchase [of a new pet food product], I read the ingredient list for [the product] . . . Since finding out about the PFAS in the packaging for 9Lives, Meow Mix, and Kibbles n' Bits I am willing to spend more money on a brand that I have now come to trust and became familiar with.").

Additionally, despite the named plaintiffs stating in their January 2025 depositions that they did not read the product labels prior to purchasing Smucker products, later evidence produced by plaintiffs suggests otherwise. Jeruchim testified in her October 25, 2025 supplemental declaration that she "do[es] review the packaging of pet food products when [she] buy[s] them," and is "certain [she] did the same thing when buying Meow Mix for the first time almost 10 years

9

United States District Court
Northern District of California

ago." Jeruchim Supp. Decl. ¶ 7. Similarly, Vargas testified that the "first time [she] bought [defendant's products], [she] did look at the packaging and saw what type of pet each brand was for and that there was no mention of PFAS on the packaging." Vargas Supp. Decl. ¶ 5. This evidence seems to refute Smucker's claims to the contrary.

Considering this evidence, plaintiffs make clear that they are "unable to rely on [Smucker's] advertising or labeling in the future" and "will not purchase the product although [they] would like to." *DZ Reservation*, 96 F.4th at 1240. *DZ Reservation* held that this is enough to establish an "actual" injury, and I see no reason to depart from this logic.

Smucker also argues that plaintiffs cannot demonstrate that their injury was "actual or imminent" or "concrete and particularized," as the "injury to which [they] point seems to be 'the undisclosed presence of PFAS' in product packaging.'" Oppo. at 8 (citing Mot. at 14). In Smucker's view, this has "nothing to do with what Plaintiffs bargained for when they purchased pet food," so the injury "must be something else more related to the consumer's purchase decision: either that PFAS in the packaging migrates *to the food* itself, or that there is a *risk* of migration occurring." *Id.* (emphasis in original). Because these two injuries are "hypothetical and conjectural," Smucker concludes that plaintiffs' injuries are neither actual nor concrete. *Id.*

Smucker misreads the allegations in the complaint. Plaintiffs assert an economic theory of liability, with the undisclosed presence of PFAS in the product being the vehicle causing plaintiffs' injuries. Their complaint, which seeks to recover under various unfair competition laws, reiterates on multiple occasions that plaintiffs seek redress for economic injuries. *See* TAC ¶ 19 ("As a direct result of Defendants' material misrepresentations and omissions, Plaintiff Jeruchim suffered, and continues to suffer, economic injuries"); *id.* ¶ 23 (same for Plaintiff Vargas); *id.* ¶ 57 (same for all class members); *id.* ¶ 66 ("Plaintiffs and Class Members purchased, paid a premium (up to the full-price), or otherwise paid more for the Products when they otherwise would not have absent Defendants' misrepresentations and omissions"); *id.* ¶ 104 ("Plaintiffs and the Class members have suffered harm as a result of these violations of the CLRA because they have incurred charges and/or paid monies for the Products that they otherwise would not have incurred or paid, and were unknowingly exposed to a significant and substantial health risk.").

10

Economic injury is a quintessential type of harm to establish an injury-in-fact. *See Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017). That plaintiffs have "no evidence that PFAS migration occurred with respect to any of [the] products they purchased" (as Smucker argues) is irrelevant and, as described later below, inaccurate. Oppo. at 8. If plaintiffs had alleged physical harm to their pets because of Smucker's products, evidence of PFAS migration would be important. But plaintiffs' theory of liability does not rely on such direct harm. They assert that defendants failed to disclose that their products contained PFAS in its packaging, resulting in their "overpaying" for Smucker products. Repl. at 5. While the parties dispute the reliability of the evidence of PFAS migration submitted by plaintiffs' expert, Dr. Wilkins, this is a question of fact that goes to the merits of plaintiffs' claims, not the jurisdictional standing issue. Plaintiffs' alleged injury occurred from the point of purchase, where they paid for a product marketed as safe and free from PFAS. This is enough to establish an injury-in-fact.

### 2. Traceability and Redressability

In addition to an injury-in-fact, the two remaining standing elements are also satisfied. The harm asserted by plaintiffs is traceable to defendants' conduct because plaintiffs purchased products at an increased price due to Smucker's alleged failure to label its products with a PFAS warning label. And the remedies they seek—among other things, declaratory, compensatory, and injunctive relief—would redress their harms should a jury find in their favor.

### B. Statutory Standing

Smucker also maintains that plaintiffs' "lack of reliance . . . disqualifies them from statutory standing under the CLRA, FAL, and UCL." *See* Oppo. at 9–13. I disagree.

Statutory standing is a "distinct legal analys[i]s" from Article III standing. *Corbett v. Pharmacare U.S., Inc.*, 544 F. Supp. 3d 996, 1005 (S.D. Cal. 2021) (citing *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1174–75 (9th Cir. 2004)). CLRA, FAL, and UCL claims are all California consumer protection statutes, and courts routinely analyze the three together when determining if statutory standing has been met. *See James v. Chocmod USA Inc.*, 773 F. Supp. 3d 945, 955 (E.D. Cal. 2025). To establish statutory standing, a plaintiff must "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., *economic injury*, and (2) show that

11

United States District Court
Northern District of California

economic injury was the result of, i.e., *caused by*, the unfair business practice or false advertising that is the gravamen of the claim." *Kwikset Corp. v. Superior Court*, 51 Cal.4th 310, 322 (2011). Accordingly, plaintiffs must "demonstrate actual reliance on the allegedly deceptive or misleading statements, in accordance with well-settled principles regarding the element of reliance in ordinary fraud actions." *Id.* at 326–27 (citing *In re Tobacco II Cases*, 46 Cal.4th 298, 306 (2009)).

Smucker contends that the actual reliance requirement is fatal to the named plaintiffs' claims, as any "misrepresentation of omission" must be a "substantial factor" in their purchasing decisions. Oppo. at 10 (quoting *Sud v. Costco Wholesale Corp.*, 229 F. Supp. 3d 1075, 1083 (N.D. Cal. 2017), *aff'd*, 731 F. App'x 719 (9th Cir. 2018)). Smucker's conclusion rests on the fact that the named plaintiffs "testified that they did *not* read any of Smucker's labeling or packaging materials," and thus cannot allege an injury that they "reli[ed] on" the health claims made by Smucker. *Id.* But, as described above, the named plaintiffs later clarified that they did, in fact, read the Smucker product labels and relied on its omission of any PFAS warnings in deciding to purchase the products. Jeruchim Supp. Decl. ¶¶ 6–7; Vargas Supp. Decl. ¶¶ 5–6. The reliance factor thus appears to be met.

So too are the remaining statutory standing factors. First, plaintiffs' complaint establishes an economic injury. To plead an economic injury, a plaintiff must show that "he or she would not have bought the product but for the misrepresentation." *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1104 (9th Cir. 2013) (quoting *Kwikset*, 246 P.3d at 890). As discussed above, plaintiffs have done just that: each named plaintiff declared that but for the alleged PFAS misrepresentation, they would not have bought Smucker products. This then resulted in an upcharge for a product that they believed was free of PFAS, establishing an actual and concrete injury for purposes of Article III standing.

Second, plaintiffs establish causation. They contend that Smucker knew their products contained PFAS as early as 2017 yet made no changes to their product packaging or labeling. Declaration of Timothy Fisher ("Fisher Decl.") Ex. 9 ("Stefanescu Depo. Tr.") at 68:2–14. Instead, the disputed products contained labeling that declared the products were healthy and nutritious. *See* TAC ¶¶ 50–52. The named plaintiffs then assert that they relied on these

12

representations (and omissions) when purchasing Smucker products.  Jeruchim Supp. Decl. ¶¶ 6–7; Vargas Supp. Decl. ¶¶ 5–6.  On these grounds, the named plaintiffs appear to meet their statutory burden in establishing standing under the UCL, FAL, and CLRA.

Smucker also contends that the remaining proposed class members cannot demonstrate reliance, but this claim similarly fails.  *See* Oppo. at 11.  "[A]s long as named plaintiffs are able to demonstrate reliance . . . that caused them injury, a presumption of reliance arises on behalf of all class members."  *In re JUUL Labs., Inc., Mktg. Sales Pracs. & Prods. Liab. Litig.*, 609 F. Supp. 3d 942, 986–87 (N.D. Cal. 2022).[3]  As I explain in greater detail below, testimony from the named plaintiffs establishes that they relied on the alleged omissions on Smuckers products in making their purchasing decisions; a presumption, therefore, arises on behalf of the proposed class members.  *See id.*

On these grounds, plaintiffs appear to meet their statutory burden in establishing standing under the UCL, FAL, and CLRA.

**II.     RULE 23(A)**

Rule 23(a) requires that plaintiffs show numerosity, commonality, typicality, and adequacy.  Fed. R. Civ. Proc. 23(a).  Smucker does not challenge numerosity.  It challenges commonality, typicality, and adequacy, combining its challenge to commonality with its arguments under Rule 23(b)(3) about predominance.  *See generally* Oppo.  Accordingly, I address the 23(a) factors in this section, except for commonality, which I address later.

**A.     Numerosity**

The class here "is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  "[C]ourts within the Ninth Circuit generally agree that numerosity is satisfied if the

---

[3] Plaintiffs also point to *Walker v. Life Insurance Company of the Southwest*, 953 F.3d 624 (9th Cir. 2020), to argue that there is a "conclusive presumption" of reliance when "three elements are satisfied: (1) common exposure, (2) individual reliance, and (3) materiality."  Repl. at 8 (referencing 953 F.3d at 630).  This reading is slightly overbroad: in the case of misrepresentations, a "conclusive presumption" of reliance only arises when "the defendant so pervasively disseminated material misrepresentations that all plaintiffs must have been exposed to them."  *Walker*, 953 F.3d at 631.  Here, there appears to be no dispute that Smucker did not include any PFAS labeling on the disputed products during the sought-after class period.  Accordingly, it seems reasonable to assume that "all plaintiffs . . . [were] exposed to" the same alleged "material misrepresentations" to establish reliance.  *See id.*

United States District Court
Northern District of California

class includes forty or more members." *Hilario v. Allstate Ins. Co.*, 642 F. Supp. 3d 1048, 1059 (N.D. Cal. 2022), *aff'd*, No. 23-15264, 2024 WL 615567 (9th Cir. Feb. 14, 2024) (citations omitted). Here, Smucker sold millions of units of the disputed products in California. Mot. at 16 (citing Weir Decl. ¶ 63). While this number refers to the units sold, not the number of individuals who purchased the products, it seems reasonable to infer that this threshold is easily met here.

### B.      Typicality and Adequacy

Plaintiffs have shown that the named plaintiffs' claims are both typical of the proposed class and adequately represent the proposed class's interests. Rule 23(a)(3) requires "claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Similarly, Rule 23(a)(4) requires that the "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). These inquiries "tend to merge." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982).

I first address typicality. "Typicality focuses on the class representative's claim—but not the specific facts from which the claim arose—and ensures that the interest of the class representative aligns with the interests of the class." *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1116 (9th Cir. 2017). "Measures of typicality include whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Torres v. Mercer Canyons, Inc.*, 835 F.3d 1125, 1141 (9th Cir. 2016) (internal quotation marks and citation omitted).

Smucker argues that plaintiffs cannot represent the interests of the entire class because they "didn't seek out representation to bring this lawsuit"; rather, plaintiffs' counsel "found *them*." Oppo. at 13 (emphasis in original). Additionally, the named plaintiffs "pivot[ed] to a harder-to-prove omission-based theory" that makes them "vulnerable to unique defenses" and "in a different position from the rest of the putative class." *Id.* (quoting *Mazur v. eBay Inc.*, 257 F.R.D. 563, 569 (N.D. Cal. 2009). Finally, because the named plaintiffs "seek . . . a full refund, but only seek a price premium differential for the putative class," Smucker concludes that the named representatives are atypical for the proposed class. *Id.*

United States District Court
Northern District of California

Smucker's first argument—that the named representatives are atypical because they were sought out by plaintiffs' counsel—is unpersuasive. It is premised on the fact that the named plaintiffs seemingly "contradict[ed] them[selves] when deposed." Oppo. at 13. But as explained above, later evidence shows that the named plaintiffs did, in fact, provide testimony that supported plaintiffs' original theory of this case. Jeruchim Supp. Decl. ¶¶ 6–7; Vargas Supp. Decl. ¶¶ 5–6.

Smucker's "vulnerable to unique defenses" claim also fails. *See* Oppo. at 13. Smucker contends that plaintiffs' "pivot to a harder-to-prove omission-based theory" was rooted in their inability to rely on the original claims raised by Humphrey. *See id.* Smucker primarily relies on *Mazur v. eBay, Inc.*, to support this argument, but *Mazur* is inapposite. 257 F.R.D. 563 (N.D. Cal. 2009). There, the court was presented with a putative class action regarding eBay's alleged use of "shill bids" to "artificially inflate the price that a winning internet bidder pays for a given item, by creating the illusion that there is substantial demand for each item." 257 F.R.D. at 565. On the question of typicality, the court found that the named plaintiffs failed to represent the putative class for two reasons. *Id.* at 568. First, plaintiffs raised claims under the CLRA, which is meant to "protect consumers," not corporations; the named plaintiff used eBay to "purchase items for her business and not her own use." *Id.* Second, the named plaintiff was "subject to unique defenses" because she was both a buyer and seller on eBay. *Id.* at 569. This "raise[d] a host of issues with regard to her conduct," such as whether she "herself engaged in shill bidding," which "may [have] put her at variance with other members of the class." *Id.* at 569.

Here, unlike in *Mazur*, Smucker does not identify what "unique defenses" the named plaintiffs may be subject to that the putative class is not. *See id.* While Smucker points out the changed testimony of the named plaintiffs, this argument has been rebutted above. Without such evidence, Smucker cannot show how Vargas or Jeruchim are akin to the named plaintiff in *Mazur*, who displayed a legitimate difference from the putative class as *both* a buyer and seller. *See id.* I do not agree that *Mazur* applies cleanly to the facts of this case.

While I take Smucker's point regarding different remedies, I think its argument overstates the record and scope of plaintiffs' claims. Smucker points out that while plaintiffs' expert, Mr. Gaskin, "only measured a price premium theory of recovery" for the class, the named plaintiffs

seek a "full refund" on their claims.  Oppo. at 13–14 (quoting Mot. at 15 ("Plaintiffs paid 100% more . . . than they would have" otherwise)).  Because plaintiffs "seem okay with leaving 'full refund' off the table for the class, so long as they can have their certified class and *they* get a full refund," Smucker concludes that the named plaintiffs are atypical.  *Id.* at 14.  But seeking different reasonable remedies than the putative class does not make named plaintiffs atypical. Smucker does not explain why the named plaintiffs should be barred from representing the class on this basis.

Similarly, Smucker's adequacy arguments fail.  "To determine whether" adequacy is satisfied, courts consider whether "the representative plaintiffs and their counsel have any conflicts of interest with other class members, and [whether] the representative plaintiffs and their counsel prosecute the action vigorously and on behalf of the class."  *Staton v. Boeing Co.*, 327 F.3d 938, 958 (9th Cir. 2003) (citations omitted).  Smucker argues that "Jeruchim and Vargas seem 'startlingly unfamiliar' with this case," as both were "replacement plaintiffs whom Plaintiffs' counsel solicited on Facebook and Craigslist."  Oppo. at 14 (citing *Gamino v. KPC Healthcare Holdings, Inc.*, No. 5:20-cv-01126-SB-SHK, 2022 WL 1043666, at *2 (C.D. Cal. Apr. 5, 2022) (quoting *Moeller v. Taco Bell Corp.*, 220 F.R.D. 604, 611 (N.D. Cal. 2004)); Jeruchim Dep. 50:20-52:5; Vargas Dep. 94:21-96:1).  Further, Smucker contends that "Jeruchim did not read the Third Amended Complaint before signing on as a plaintiff," and the Vargas "skimmed through it," but found it "confusing" because "it looked the same as everything else."  *Id.* (citing Jeruchim Dep. 53:1-7; Vargas Dep. 13:24-14:11).  Because Smucker believes that plaintiffs demonstrate a "lack of involvement, interest, or understanding of what this case was, or is, about," it concludes that neither Jeruchim nor Vargas are adequate to serve as class representatives.  *Id.*

In response, plaintiffs assert that because Jeruchim and Vargas do not have conflicts with other class members and can vigorously prosecute this case, they are adequate class representatives. Repl. at 11-12.  With respect to Smucker's "replacement plaintiffs" argument, plaintiffs contend that "all that matter[s] is that both Plaintiffs incurred the same injury by Defendants' PFAS Omission as the prior named plaintiff," which is met here.  *Id.* at 11.  Further, "the record reflects Plaintiffs' general understanding of the nature of the case and of their duties as class representatives."  *Id.* at 11-12 (citing Jeruchim Decl. ¶¶ 8-9, Jeruchim Depo. Tr. at 49:9-17,

United States District Court
Northern District of California

16

54:9-15; /10/25 Vargas Decl. ¶¶ 9-10, Vargas Depo. Tr. at 93:22-25, 94:1-10). In a similar vein, plaintiffs conclude that Jeruchim and Vargas's alleged forgetfulness or confusion about legal documents is "inconsequential" and not indicative of their ability to represent the class. *Id.* at 12.

As Smucker expressly recognizes in its opposition, the "threshold of knowledge required to qualify as a class representative is low," and "a party must be familiar with the basic elements of her claim." *Gamino*, 2022 WL 1043666, at *2. I do not agree with Smucker that the alleged incidents reflect a "startling[] unfamiliar[ity]" with the case. That plaintiffs' counsel reached out to the named plaintiffs to serve as named plaintiffs does not impact their ability to represent the class. Nor does Vargas and Jeruchim's failure to comprehend certain filings indicate their adequacy as class representatives, as they have proven elsewhere that they understand the basic elements of their claims and what their responsibilities as named plaintiffs entail. Accordingly, it appears that the adequacy requirement is met.

## III.    RULE 23(B)(3)

In addition to meeting the Rule 23(a) requirements, a plaintiff seeking class certification must also meet one of the threshold requirements under Rule 23(b). Plaintiffs meet this requirement under Rule 23(b)(3).

### A.    Predominance

Under Rule 23(b)(3), plaintiffs must show that the "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). "The Rule 23(b)(3) predominance requirement is 'even more demanding' than Rule 23(a)'s commonality counterpart." *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1094 (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013)). "The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (internal quotations omitted). "When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered under Rule 23(b)(3) even though other important factors will have to be tried separately, such as damages or some affirmative defenses particular to some individual class members." *Id.* at 453–54 (internal quotations omitted).

17

United States District Court
Northern District of California

Plaintiffs argue that common questions of law predominate in this case for each of their theories of liability. First, with regards to their theory that the challenged products amount to affirmative misrepresentations, plaintiffs assert that they raise adequate claims under the CLRA, UCL, and FAL. Oppo. at 21-22. The CLRA makes it unlawful to use "unfair methods of competition and unfair or deceptive acts or practices" in the sale of goods or services to a consumer. Cal. Civ. Code § 1770. Plaintiffs point to the "[e]vidence of the materiality of the PFAS Omissions and Health Claims" as establishing that plaintiffs relied on Smucker's "objectively material" misrepresentations about the quality of their disputed products. Mot. at 21. Similarly, under the "fraudulent" prong of the UCL and FAL, plaintiffs must show both reliance and that "members of the public are likely to be deceived" by defendants' misrepresentations, subject to an objective test. *Id.* at 21-22; *In re Tobacco II Cases*, 46 Cal.4th 298, 325-27 (2009); *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008). Plaintiffs state that the supplemental testimonies of Vargas and Jeruchim show that "plaintiffs . . . relied on Defendants' false and material misrepresentations" and that such misrepresentations were "objectively material to the class." *Id.* at 22; Jeruchim Decl. 5, 7-8; Vargas Decl. 6-9. Finally, under the "unfair" prong of the UCL, courts must "weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim"; similarly, under the "unlawful" prong, unlawful business acts include "any practices forbidden by law," which plaintiffs contend includes defendants' alleged violation of the CLRA. Mot. at 22 (quoting *Motors, Inc. v. Times Mirror Co.*, 102 Cal. App. 3d 735, 740 (1980); *Rush v. Nutrex Rsch., Inc.*, 2012 WL 2196144, at *8 (N.D. Cal. June 13, 2012)). Plaintiffs contend that "these are inquiries common to all California class members," and thus commonality can be shown. *See id.*

Regarding their unjust enrichment theory, plaintiffs state that to prevail on this claim, "a plaintiff must demonstrate a defendant's (1) receipt of a benefit; and (2) unjust retention of the benefit at the expense of another." *Id.* (quoting *Cartwright v. Viking Indus., Inc.*, 2009 WL 2982887, at *12 (E.D. Cal. Sept. 14, 2009)). In their view, "when, as here, 'the crux of plaintiffs' claims is that defendant unjustly retained the benefits of its sale of . . . products to consumers after

18

United States District Court
Northern District of California

it failed to disclose material facts about the defective nature of those products," class certification of unjust enrichment claims is appropriate. *Id.*

Smucker advances a few arguments for why common issues do not predominate over individual ones in this case. First, Smucker argues that "where Plaintiffs *never read* (let alone relied on) Smucker's labeling, reliance cannot be presumed classwide." Oppo. at 14. I have rejected this argument above. *See* Section I.A.1, *infra.* Second, Smucker asserts that "[w]hether Smucker owed a duty to disclose the presence of PFAS in its packaging to any particular class member turns on several individualized consumer- and pet-specific issues." *Id.* at 15–21. To this point, Smucker makes three arguments. First, Smucker claims that because it never labeled its products as "PFAS Free," plaintiffs cannot rely on a classwide duty to disclose an omission contrary to any representations made by Smucker. *Id.* at 16-17. Second, any attempt to tie a duty to disclose to allegations that PFAS in the disputed products poses a "safety hazard" to pets ignores that this is a fact-sensitive, individualized inquiry. *Id.* at 17-19. Finally, even assuming PFAS migration occurred in their products, Smucker asserts that plaintiffs must show that the PFAS omission was "central to the product's function," which, again, is an individualized inquiry. *Id.* at 19-20. I address each argument in turn.

### 1.    Omission Contrary to Representation Made

Both parties acknowledge that plaintiffs' case relies on an omissions theory. Fraud based on omission requires that either the omission was "contrary to a representation actually made by the defendant," or that the "defendant was obliged to disclose" the information. *Hodsdon v. Mars, Inc.*, 891 F.3d 857, 861 (9th Cir. 2018). Plaintiffs appear to assert omission claims based on both theories, namely that Smucker's omission of the PFAS content in the pet food packaging was contrary to its representations, and separately, that it was obligated to disclose such information.

Smucker asserts that plaintiffs' first omissions theory—that the alleged omission is "contrary to a representation actually made by the defendant"—is not met by plaintiffs, as "no one . . . argues that Smucker's PFAS omission is contrary to a representation Smucker made on its labeling or in its advertising." Oppo. at 16; *Hodsdon*, 891 F.3d at 861. Smucker argues:

> Plaintiffs do not allege—and have no evidence—that the presence of
> PFAS in Smucker's packaging contradicts *any* of the claims made on

19

the Class Products' labels. Plaintiffs have not advanced this argument, and for good reason. They took no discovery about *how* the claims on product packaging are created, what veterinary science or formulation combination substantiates them, and the industry regulations that govern those claims. What is more, Plaintiffs cannot show a contradiction because they have no expert opinion that the presence of PFAS in packaging renders any particular statement in need of more fulsome disclosure.

Oppo. at 17.

Smucker relies primarily on *Erickson v. Kimberly-Clark Corp.*, No. 24-cv-07032-AMO, 2025 WL 2105830 (N.D. Cal. July 28, 2025), to conclude that plaintiffs have failed to meet their burden in showing that a reasonable consumer would be deceived based on their allegedly "contradictory" product packaging. In *Erickson*, the court was presented with whether defendants failed to disclose the presence of PFAS in their baby wipe products. 2025 WL 2105830, at *4. The court rejected the plaintiffs' predominance claims under the "contrary to representation" theory, finding that claims of the products being "plant-based" or "gentle" were not contradictory enough to make a reasonable consumer believe the products were free of PFAS, as other portions of the packaging suggested the wipes did contain "non-natural" ingredients. *Id.* at *3–*4.

Here, the crux of plaintiffs' omission theory concerns the language on the disputed products that suggests Smucker's products are "100% healthy" and "nutritious," despite containing alleged traces of PFAS. While I agree that plaintiffs' claim that the alleged presence of PFAS is not contradictory enough to the "nutritious" label, whether the presence of PFAS directly contradicts "100% healthy" is a more difficult inquiry. To resolve this question, I turn to *LeGrand v. Abbott Laboratories*, 655 F. Supp. 3d 871 (N.D. Cal. 2023). There, the Honorable Thomas Hixon dealt with a similar question regarding Ensure nutrition drinks, whose product packaging noted that the products provided "Complete, Balanced Nutrition," and were for "everyday health," despite the products being allegedly "harmful to overall health based on their added sugar content." *Id.* at 891. The court concluded that drawing all inferences in favor of the plaintiff, it was "reasonable that a consumer could be misled by packaging promoting the products as 'Complete, Balanced Nutrition' and 'for everyday health,' which implies that they help rather than harm consumer health." *Id.*

20

While the plaintiffs' evidentiary burden in *LeGrand* was slightly different, given that Judge Hixon dealt with the question at the motion to dismiss stage rather than at class certification, its underlying principles still stand. Here, plaintiffs provide enough facts to show by a preponderance of the evidence that the named plaintiffs, and consequently the putative class, relied on the representations of the products being "healthy" when deciding to purchase the disputed products, and that the presence of PFAS would be "contrary to" such representations. *See* TAC ¶ 19 ("Plaintiff Jeruchim understood [the healthful claims] to be representations and warranties by Defendants, that the Products are free from harmful ingredients and would indeed support—not detract—from the health of her pet."); *id.* ¶ 23 (same for Plaintiff Vargas); *id.* ¶ 103 (Smucker "display[ed] the Products and describ[ed] [them] as healthful, including on the product packaging, on its website, and in its marketing . . . [despite] the Products [being potentially] harmful to animal health" and "despite their knowledge that the Products were not as advertised"); *id.* ¶ 145 ("Defendants made these . . . partial representations to boost or maintain sales of the Products, and to falsely assure purchasers of the Products that Defendants are a reputable company and that their Products are healthful.").

Smucker does not need to explicitly label its products as "PFAS Free" for there to arise an assumption that the products are free of such materials; this is especially true when the rest of the packaging asserts benefits to the user's health and nutrition. Based on these facts, plaintiffs have met their evidentiary burden in establishing a class-wide basis to potentially recover under a "contrary to representation" omissions theory.

### 2. Duty to Disclose

Fraud based on omission may also be shown if plaintiffs can establish that the "defendant was obliged to disclose" the information in question. *Hodsdon*, 891 F.3d at 861. "[A] defendant only has a duty to disclose when either (1) the defect at issue relates to an unreasonable safety hazard or (2) the defect is material, central to the product's function, and the plaintiff alleges one of the four *LiMandri*[4] factors." *In re Trader Joe's Co. Dark Chocolate Litig.*, 726 F. Supp. 3d

---

[4] The *LiMandri* factors include that (1) the defendant is in a fiduciary relationship with the plaintiff; (2) the defendant had exclusive knowledge of material facts not known to the plaintiff;

United States District Court
Northern District of California

1150, 1169 (S.D. Cal. 2024) (cleaned up).  Plaintiffs need to only establish one of the prongs to prove that the defendant had a duty to disclose.  *See id.*

### a.    Unreasonable Safety Hazard

Smucker alleges that plaintiffs fail to establish that Smucker "owe[d] a duty to disclose based on the risk that PFAS in the Class Products' packaging pose[d] a 'safety hazard.'"  Oppo. at 17.  It also claims that plaintiffs' expert opinions "confirm that the 'safety' implications for PFAS in pet food packaging turn on a series of individualized consumer- and pet-specific variables."  *Id.*

Smucker maintains that plaintiffs "lack any evidence that the PFAS Omission . . . rises to a 'safety hazard' level for all members of the class," as for "any safety risk to arise, the PFAS must be able to 'migrate' from [the] outside layer [of the packaging, through one or two middle layers, then through the plastic food-contact layer and finally into the food itself."  *Id.*  This is particularly salient in light of Dr. Wilkins' testimony, Smucker claims, as her deposition showed that she "does not know whether PFAS can migrate from the outer layer of a multi-walled bag into food."  *Id.* at 18 (citing Wilkins Dep. 51:24-52:20).  Wilkins is "not a packaging specialist"; nor does she have "familiarity with Smucker's specific multi-layered packaging design from which she can assess migration risk."  *Id.* (citing Wilkins Dep. at 71:13-16; 72:7-12).  Because her cited authority–various articles discussing PFAS more broadly–lacks "any foundation for opining on a risk of PFAS migration" in this case, Smucker concludes that Wilkins' testimony cannot support a finding of predominance over a class-wide question of safety risks posed by PFAS.  *See id.*

In response, plaintiffs claim that any "minor factual variations are 'immaterial' to the question of predominance in this case" because, "[a]s Plaintiffs' evidence shows, exposure to PFAS in any quantity is damaging to pet's long-term health and must be avoided."  Repl. at 15 (citing Wilkins Decl. at 12 ("There is no established blood level of PFAS considered to be safe or normal in pets nor levels of PFAS safe for consumption by pets from food or water sources.")).  Similarly, they point out that Wilkins considered at least one "recent study (Zabaleta

---

(3) the defendant actively conceals a material fact from the plaintiff; or (4) the defendant makes material representations but also suppresses some material facts.

United States District Court
Northern District of California

et al, 2020), in which 23 PFAS substances in 25 paper and board packaging materials–including pet food bags–were screened to determine their migration into . . . foods . . . at different times and temperatures," to form her conclusion that PFAS exposure in Smucker products was likely.  Repl. at 6 n.2 (citing Wilkins Decl. at 13).  Because Wilkins establishes that "the migration of even trace amounts of PFAS from a given Products' packaging into the pet food contained therein can result in significant aggregate levels of PFAS in a pet's body as a result of repeated and frequent exposure to the PFAS and their persistent bioaccumulation," plaintiffs conclude that Smucker's duty to disclose "does not depend on any specific amount of PFAS migration or exposure."  Repl. at 15 (citing Wilkins Decl. at 9-11); *Zeiger*, 526 F. Supp. 3d at 681.

Plaintiffs' argument is well-taken.  As a preliminary matter, Smucker does not move to exclude the testimony of Wilkin under *Daubert*.  Repl. at 6 n.2.  Nor does it provide evidence contradicting Wilkin's findings—rather, Smucker's entire theory is that Wilkins does not have enough knowledge or information from her studies to conclude that the PFAS on the exterior of Smucker products could cause harm to the entire class.  But enough evidence is present in Wilkin's testimony to show that her opinion is sufficient to find predominance.  Wilkins points to PFAS studies involving pet foods bags, where it was found that "high concentrations of PFASs were detected."  Wilkins Decl. at 13.  She states that the risk of migration is especially high where, as in Smucker products, PFAS is "used in paper food packaging as [a] grease-proofing agent, and where the PFAS-containing packaging is stored in increased temperatures for longer periods of time, as is typical of pet food products."  Repl. at 5-6 (citing Wilkins Decl. 13-14).

While I take Smucker's point that Wilkins does not rely on any evidence or studies involving migration of PFAS in multi-layer packaging, this is not because Wilkins willfully ignored this evidence—no studies have been performed on this issue.  Wilkins provides enough evidence from analogous studies, however, to suggest that questions of fact and law predominate amongst the class.  Nor does Smucker provide any evidence suggesting that migration is *not* possible even with the multi-layer packaging.  Additionally, as indicated above, Smucker appears to misunderstand plaintiffs' theory of liability in this case: they do not argue that the "undisclosed presence of PFAS  . . . is [what] caused Plaintiffs' legal injury," but rather, that they "suffered, and

23

continue[] to suffer, *economic* injuries" stemming from Smucker's omissions and misrepresentations. Repl. at 4 (quoting TAC 19, 23). Whether Wilkins' evidence suggests that certain animals may be impacted more by the amount of PFAS present in their product does not dispel the common issue that her testimony appears to resolve: whether or not PFAS could, in fact, migrate from the exterior to the interior of the packaging. Enough evidence suggests this to be plausible. Smucker's concerns go more towards the weight of the evidence, a question that gets to the merits of the case and is inapplicable at this stage.

This conclusion is buttressed by *Zeiger v. WellPet.* 526 F. Supp. 3d 652 (N.D. Cal. 2021). There, I dealt with a similar question regarding the presence of arsenic, lead, and bisphenol A ("BPA") in WellPet dog food products. *Id.* at 663. Plaintiffs' theory for predominance for class certification, based primarily on an expert opinion, was a "bioaccumulation" theory. *Id.* at 670. Bioaccumulation refers to the "build-up of a substance as it is ingested over time." *Id.* Relying on various published studies, plaintiffs' expert concluded that, in his opinion, there was "no safe level of lead and arsenic in the [pet] food" based on the bioaccumulation theory, and that any presence of any of these metals would pose health risks for animals. *Id.* I agreed, finding that "because of the bioaccumulation theory," evidence that the products posed a health risk to consumers need not show a specific amount of exposure to the lead, arsenic, and BPA. *Id.* at 681. As in *Zeiger*, plaintiffs' migration theory, and Wilkins' opinion, does not require proving exposure to a specific amount of PFAS—rather, in plaintiffs' view, *any* prolonged exposure to PFAS is harmful to animals. That is the common question they claim unites each putative class member.

For these reasons, I disagree with Smucker's conclusion that individual issues do not predominate given the potential disparate health effects the migration of PFAS may have on each class members' pet(s). *See Hadley*, 324 F. Supp. 3d at 1102–03 (finding the potential "health impact of consuming added sugar . . . differ[ing] for each consumer" was immaterial to the case, as plaintiff sought redress for economic, not physical, injuries); *Chacanaca v. Quaker Oats Co.*, 752 F. Supp. 2d 1111, 1125 (concluding that any potential health differences due to Chewy Bar's mislabeling practices was immaterial considering the plaintiffs' case focused on economic injuries). Plaintiffs can establish predominance under the "unreasonable safety hazard" prong.

### b.    Centrality to the Product's Function

Next, Smucker argues that even if PFAS migration *does* happen, plaintiffs "must show that Smucker's omission was 'central to the product's function,'" which is an individualized inquiry. Oppo. at 19 (quoting *In re Trader Joe's Co. Dark Chocolate Litig.*, 726 F. Supp. 3d at 1169 (cleaned up)). Smucker points to *Erickson* as instructive. 2025 WL 2105830, at \*5. There, the court found that "a defect goes to the central functionality of a product when it prevents the product from performing a critical or integral function, or renders the product incapable of use." *Id.* This is not about "subjective preferences of a product, but rather the effect on a core function of the product." *Id.*

Here, Smucker contends that the "core function of pet food is clear; it is to feed the pet," and plaintiffs "do not allege, let alone prove, that the presence of PFAS in Smucker's packaging prevented them from feeding their pets." Oppo. at 19 (citing Jeruchim Dep. 55:12–14 (showing that MeowMix probably "filled [Jeruchim's cat's] tummy"); Vargas Dep. 74:8–75:18 (showing that Vargas recognized her pets' nutritional needs were met by Smucker's products)). Because "concerns about a product's safety differ from effects on its central function, and indeed comprise a separate theory of omission, i.e., the unreasonable safety hazard theory," Smucker concludes that the *Erickson* case prevents plaintiffs' omission theory from going forward. Oppo. at 19–20.

I agree with Smucker on this point. Plaintiffs do not establish in their TAC or supporting briefs how the presence of PFAS in the Smuckers product is more than a "subjective preference[] about a product." *Hodsdon*, 891 F.3d at 864. In *Hodsdon*, the court recognized that this factor focuses on physical defects, such as a "computer chip that corrupts the hard drive, or a laptop screen that goes dark": features that "render[] those products incapable of use by any consumer." *Id.* Similar to how the court recognized that "some consumers of chocolate are not concerned about the labor practices used to manufacture the product," so too may some consumers not be concerned about the presence of PFAS on the surface of the Smucker products. *See id.* Plaintiffs fail to establish that Smucker had a duty to disclose the presence of PFAS on the products. *See id.*

United States District Court
Northern District of California

25

That said, *Erickson* makes clear that a duty to disclose arises *either* when there is an "unreasonable safety hazard" *or* there is a "material [defect] central to the product's function." 2025 WL 2105830, at *4. Finding the potential of an unreasonable safety hazard by the presence of the PFAS product, it is immaterial whether the PFAS has disrupted the "central" feature of the pet food products. Because plaintiffs have satisfied the "unreasonable safety hazard" element, they have shown that predominance is met under Rule 23(b)(3).

### B.    Superiority

In addition to establishing that common questions of law and fact predominate, plaintiffs must show that class litigation is superior to other available methods for fair and efficient adjudication. Fed. R. Civ. P. 23(b)(3). In considering whether class litigation is superior, relevant factors include "(1) the class members' interest in prosecuting their actions individually; (2) the extent and nature of pre-existing litigation by class members concerning the controversy; (3) the desirability of concentrating the litigation in this particular forum; and (4) the difficulties in managing the class action." *Id.*

This factor is met; indeed, Smucker does not appear to address it at all. As plaintiffs point out, here, "the prices paid for the Products ranged between $2.99 and $23.99," and "[s]uch small dollar amounts do not provide an incentive for consumers to bring individual claims." Mot. at 24 (citing Gaskin Decl. ¶¶ 51, 62 n.59, 63; *Mullins v. Premier Nutrition Corp.*, 2016 WL 1535057, at *8 (N.D. Cal. Apr. 15, 2016) (cases "'where litigation costs dwarf potential recovery' are paradigmatic examples of those well-suited for classwide prosecution")). Because it would "not otherwise be economically feasible to obtain for each class member given the small size of each class member's claim," superiority is demonstrated. *Id.*; *see also Mullins*, 2016 WL 1535057, at *8 (finding superiority where "individual suits for small recovery amounts would overwhelm the courts and prove uneconomic for potential litigants").

### IV.    SEALING MOTIONS

Plaintiffs also filed conditional motions to seal information that Smucker has identified as being confidential under its stipulated protective order. *See* Dkt. Nos. 85, 91, 98. Although Smucker has proposed narrow redactions, s*ee* Dkt. Nos. 86, certain information it identifies as

United States District Court
Northern District of California

26

United States District Court
Northern District of California

being confidential does not appear to be likely to cause competitive harm, including its potential knowledge about PFAS in the disputed products.  This information does not qualify under the "compelling reasons" standard for sealing.  *See Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1101–02 (9th Cir. 2016).  Plaintiffs' conditional motion is DENIED.  This is not to say that Smucker is not entitled to seal specific, relatively current information that would cause competitive harm if disclosed.  Weir and Gaskin's identification of the units of products sold in California during the class period may be an example of that.  But Smucker needs to further reduce its requests to only include those with compelling reasons for sealing.

Accordingly, within ten (10) days of this Order, Smucker shall revisit the information it seeks to file under seal and submit a chart that identifies any fiscal information or other information that may cause it competitive harm.  I will issue a final sealing order after reviewing the chart.

## CONCLUSION

Plaintiffs have met their burden in establishing both the Rule 23(a) and Rule 23(b)(3) factors and their motion for class certification is GRANTED.  The Court CERTIFIES the following Rule 23(b)(3) class:

> All persons in California who from November 4, 2018, to and through December 31, 2022, purchased any of Defendants' 9Lives-branded, Kibbles 'n Bits-branded, and/or Meow Mix-branded products at issue (the "Class").

The Court APPOINTS Sandra Jeruchim and Melissa Vargas as the representatives of the class.  The Court also APPOINTS Bursor & Fisher, P.A., as class counsel.

**IT IS SO ORDERED.**

Dated: January 22, 2026

William H. Orrick
United States District Judge

27